THE G. L. GARLIC.

THE C. E. LELAND.

*(District Court, N. D. New York. March, 1891.)*

HARBORS—DUMPING REFUSE—LIMITS—ORDERS.

Act Cong. June 29, 1888, "to prevent injurious deposits in the harbor and adjacent waters of New York city," declares that "the placing, discharging, or depositing * * * of refuse, dirt, * * * or any other matter of any kind, * * * in the tidal waters of the harbor of New York or its adjacent or tributary waters, or in those of Long Island sound, within the limits which shall be prescribed by the supervisor of the harbor, is hereby strictly forbidden." The supervisor made an order that the depositing of such refuse, etc., "must take place east of meridian 73° 55' 56" W. (which passes through the Scotland light-ship) and south of parallel 40° 31' N." *Held*, that the order must be so construed as to allow dumping at all points east of the named meridian, or south of the named parallel, and not to confine it to points that are both east of the meridian and south of the parallel.

In Admiralty.

These are libels filed by the United States, under the act of June 29, 1888, (25 St. at Large, 209,) to recover penalties for dumping mud, dredgings, etc., into the waters of the Hudson river. The first section of the act provides "that the placing, discharging or depositing, by any process or in any manner, of refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or any other matter of any kind, other than that flowing from streets, sewers, and passing therefrom in a liquid state, in the tidal waters of the harbor of New York, or its adjacent or tributary waters, or in those of Long Island sound, within the limits which shall be prescribed by the supervisor of the harbor, is hereby strictly forbidden." Violations of this section are made misdemeanors punishable by imprisonment, or a fine of not less than $250 or more than $2,500. The supervisor of the harbor appointed under this act issued the following order pursuant to the provisions of the first section:

"The deposit of refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or matter of any kind, other than that flowing from streets or sewers, and passing therefrom in a liquid state, must take place east of meridian 73° 55' 56" W., (which passes through the Scotland light-ship,) and south of parallel 40° 31' N."

The point where the parallel and the meridian intersect is some three miles south of Coney island and five miles east of Sandy Hook. In the summer of 1890 the tugs in question were engaged in towing mud scows loaded with dredgings, taken from the channel of the Hudson river, to a point near Stone House dock, which is opposite New Baltimore and a few miles south of Albany. The point where the scows discharged their loads was about 8 miles east of meridian 73° 55' 56" W., and about 125 miles north of parallel 40° 31' N. The work was done under the auspices of the state of New York, with the design of improving the navigation of the river. The mud taken from the channel was deposited in

shoal water near the river bank and about a quarter of a mile from the channel waters, at a point designated by the superintendent of public works of the state of New York. The waters of the Hudson river rise and fall with the tide as far north as the state dam at Troy.

*Frank G. Ferguson*, Asst. Dist. Atty.

*W. Frothingham*, for claimants.

Coxe, J., (*after stating the facts as above.*) The intention of congress in passing the act of June 29, 1888, is clearly expressed in its title. It is "An act to prevent injurious deposits *within the harbor and adjacent waters* of New York city," etc. Deposits which do not injuriously affect the harbor are not prohibited by the act. It was the harbor that the law-makers had in view; it was the harbor that they sought to protect. Recognizing the fact that the usefulness of the harbor would be destroyed if its approaches were obstructed, the act is careful to designate all waters adjacent or tributary to the harbor, where the dumping of deposits can, in any manner, affect it injuriously. It will be observed, however, that dumping is not forbidden in all parts of the enumerated waters, but only in such parts of these waters as are "*within the limits* which shall be pre-scribed by the supervisor of the harbor." It can hardly be presumed that congress intended, under pretense of protecting the harbor of New York, to require refuse taken from the harbors of Stonington or New London, for instance, to be towed through the sound and dumped far out at sea. Improvements at Albany and Troy and in the harbors of ports along the sound will have to cease if dredgings taken therefrom are to be towed several hundred miles and dumped at a designated point in the Atlantic ocean. Clearly congress did not intend to weigh down a law, having a single object to accomplish, with conditions so expensive, onerous and useless.

The purpose of the act is to prevent dumping where it will injure the harbor and to prevent it nowhere else. To insure this result the super-visor, taking the waters enumerated in the act as the theater of his op-erations, is required to draw protecting lines around the harbor. When these lines are fixed the act becomes operative. Within them is the harbor of New York and such waters as are necessary for the protection of the harbor. *Within these limits*, says the act, no dumping shall be done, *without* them it is not prohibited. The supervisor had no power to issue his ukase commanding that all dumping *shall be done* within lim-its fixed by him far out in the Atlantic; limits which include waters not mentioned in the act. What the supervisor did do was to direct that the deposit of refuse, dirt, etc., "must take place east of the meridian 73° 55′ 56″ W., and south of parallel 40° 31′ N." The libelant insists that this order means that the dumping must not only be east of the meridian, but it must also be south of the parallel, and that under the provisions of the act the supervisor had authority to make such an or-der. The claimants, on the contrary, argue—*First*, that the order is void for indefiniteness; *second*, that the libelant's construction is inad-missible under the act; and, *third*, that if sustained at all the order must

be construed as fixing, within the designated meridian and parallel, the limits beyond which, at all points, both on the east and south, refuse may be deposited. The situation can best be illustrated by the following diagram showing these opposing theories:

The libelant contends that dumping must all take place within the angle represented by the dotted lines. The claimants contend that, if the supervisor's order can be upheld at all, it must be construed to prohibit dumping within the angle formed by the plain black lines. If the libelant's theory is correct, the supervisor possessed the power to fix upon any point in the ocean where a meridian and parallel intersect, and command every person from Coney island to Troy and from Staten island to Montauk point, under pain of imprisonment, to deposit refuse material at the vertex, or somewhere within the ever-widening lines, of the angle thus formed—an angle which necessarily includes a large part of the Atlantic ocean in no way referred to in the act. Under such a construction a contractor engaged in improving the harbor of Stonington, Conn., who should dump dredgings in the Atlantic 500 miles east of Boston would be liable to the penalties of the act, because the dumping would take place north of the parallel. If the power to designate an area where refuse must be deposited is once conceded, the supervisor could have named a dumping ground 10, 20, or 30 miles from New York, with as much propriety as the one he did name. It is thought that a construction which leads to such absurd results, especially in a penal statute, is out of the question. In order to reach it it is necessary to reverse the plain meaning of the first section and substitute the word "without" for the word "within." If this section made it a misdemeanor to deposit dirt, etc., *without* (outside of) the limits fixed by the supervisor, the contention of the libelant would be more plausible. The supervisor was not authorized to say where the dumping should be done, but only where it should not be done. The remaining question is, has he done so? When read alone his order certainly bears the construction put upon it by the libelant, but, as such a construction renders it utterly void, it remains to be seen whether, when considered in connection with the act, an interpretation can be placed upon it which renders it operative. Though most infelicitously expressed, it is thought that the order can be construed to mean that the deposit of refuse material may take place at any point east of the meridian or at any point south of the parallel. In other words, that no dumping is permitted within the angle formed by the plain black lines as shown on the above diagram.

The decision of the circuit court in the case of *The Sadie*, 41 Fed. Rep. 396, does not conflict with these views. The point now under discussion was not considered in that case for the reason that it was not pretended that the dumping took place east of the meridian. Although there are expressions in the opinion which appear to uphold the contention of the libelant, the following language indicates that the court construed the supervisor's order as fixing limits coincident with the northwesterly angle as indicated on the above diagram. Says the opinion, at page 399:

"In the next place, it is to be noted that, under the statute, it is not the supervisor of the harbor who is to prohibit dumping, etc., in the tidal waters

named in the act. The act itself prohibits such dumping 'within the limits which shall be prescribed' by that officer. These limits which he is to prescribe are the lines or boundaries on one side and the other of which, respectively, such material may and may not be dumped. The order made by him designates two lines, running, one *north* and the other *west*, from a point at the intersection of the meridian 73° 55' 56" W. and the parallel 40° 31' N. To the east and south of *these lines* it is expressly stated that the deposit of refuse material (repeating the phraseology of the first section) must take place. Why these lines are not thus made the limits of dumping within the meaning of the act I am at a loss to conceive. Up to them all material is to be deposited; beyond them it is not to be deposited. The limits being thus fixed, the first section becomes operative, and persons or vessels depositing such material *within these* lines, upon the waters enumerated in the act, become liable to the penalties prescribed thereby."

The italics do not appear in the opinion and are introduced to emphasize the point in question.

It seems quite clear that if the circuit court intended to sanction the theory that the supervisor had power to designate a dumping ground and make a criminal of every person depositing refuse material elsewhere, it would have described the south-easterly angle as above shown—an angle formed by two lines running, one *south* and the other *east* from the point of intersection—instead of using the language above quoted. As the tugs were not engaged in dumping within the limits prescribed by the supervisor, it follows that the libels must be dismissed.