## WARNER–QUINLAN CO. v. UNITED STATES.

### (Circuit Court of Appeals, Third Circuit. June 17, 1921.)

### No. 2655.

**1. Navigable waters ⚶14(3)—Proof supervisor had prescribed limits within which dumping of refuse was prohibited is essential.**

It is essential to conviction under Act June 29, 1888, c. 496, § 1 (Comp. St. § 9933), for discharging refuse in the harbor of New York or its adjacent or tributary waters, within limits which shall be prescribed by the supervisor of the harbor, that the evidence establish that the supervisor had prescribed such limits.

**2. Navigable waters ⚶14(3)—Purpose of statute against dumping in harbor is to prohibit obstruction and injury.**

The purpose of Act June 29, 1888, c. 496, § 1 (Comp. St. § 9933), prohibiting the discharge of refuse, ashes, mud, dredgings, acid, or any other matter in the harbor of New York or its adjacent or tributary waters, was to prevent the discharge therein of any matter which would tend to obstruct navigation or would injure boats in the harbor.

**3. Navigable waters ⚶14(3)—Only matter of kind similar to enumerated articles is within prohibition against dumping.**

Act June 29, 1888, c. 496, § 1 (Comp. St. § 9933), prohibiting the dumping of numerous specified articles, or any other matter of any kind in the harbor of New York, applies, under the maxim of ejusdem generis, only to matter of the same general class as the articles mentioned, and since the mentioned articles are those which obstruct navigation or injure vessels, only articles having the same effect are within the prohibition.

**4. Navigable waters ⚶14(3)—Evidence held to show matter dumped into harbor was "sludge," which obstructed and injured navigation.**

Evidence that the operator of an asphalt plant was discharging into Arthur Kill and into the harbor of New York matter described by the witnesses as fuel matter, sludge, oil, and tar, which sometimes became solid and settled as a sediment, *held* to show that defendant was discharging into the harbor sludge, contrary to Act June 29, 1888, c. 496, § 1 (Comp. St. § 9933), since "sludge" is defined as refuse from the refining of petroleum; muddy or pasty refuse of various kinds; sediment.

In Error to the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

The Warner-Quinlan Company was convicted of discharging refuse into New York Harbor, and it brings error. Affirmed.

Frederick M. P. Pearse, of Newark, N. J., for plaintiff in error.

John Ridley, of Jersey City, N. J., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. The Warner-Quinlan Company, a corporation of New Jersey, was indicted under the Act of Congress of June 29, 1888, c. 496, § 1, 25 Stat. 209 (section 9933, United States Compiled Statutes), which provides that:

"The placing, discharging, or depositing, by any process or in any manner, of refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid or any other matter of any kind, other than that flowing from streets, sewers, and passing therefrom in a liquid state, in the tidal waters of the harbor of New York, or its adjacent or tributary waters, or in those of Long Island Sound, within

the limits which shall be prescribed by the supervisor of the harbor, is hereby strictly forbidden, and every such act is made a misdemeanor," etc.

The indictment charges:

"That on or about the 24th day of August, 1920, and some time prior thereto and up to the present time, the Warner-Quinlan Company did discharge a large quantity of tar and asphalt in the tidal waters of the harbor of New York and its adjacent tributary waters, * * * as prescribed by the supervisor of the harbor."

The defendant company is engaged in operating a large asphalt plant at Tremley Point, in Union county, N. J., from which, the evidence tends to show, certain matter was discharged into the water of the harbor of New York adjacent to the plant of the defendant company through a ditch and a pipe running from the plant. There was evidence also tending to show that oil seeped through the marsh on which the plant was located, and that oil reached the waters of the harbor because of a defective oil separator tank.

In order to sustain the conviction, it is necessary that the evidence show, first, that the supervisor, in pursuance of the statute, had prescribed limits in the tidal waters of the harbor of New York or its adjacent or tributary waters; and, second, that the defendant had, at or within the time or times specified in the indictment, placed, discharged, or deposited by some process or in some manner some of the forbidden matter within those prescribed limits.

[1] The defendant contended that it had not been sufficiently established by the evidence that the supervisor had prescribed the limits in the tidal waters of the harbor of New York, or those adjacent or tributary thereto, into which the statute forbade that any of the matter mentioned should be placed, discharged, or deposited by any process or in any manner. It is necessary that the supervisor prescribe the limits, for any and all of the matter mentioned may enter any of the waters, except within the limits thus prescribed. These limits should plainly appear, so that any person proposing to deposit any prohibited material at any particular place might know whether such deposit is forbidden and criminal. United States v. The Sadie (D. C.) 41 Fed. 823. But the defendant, well knowing the facts and that they could easily be established on a retrial, if need be, expressed a desire to have the case considered on its merits, and commendably withdrew that contention, as well as the assignment of error based upon amendment to the indictment at the trial.

[2] The second and only other question is whether or not the matter which came from the defendant's plant and entered the waters of the harbor are among those forbidden to be placed therein. The defendant properly contends that the purpose of the statute is to prevent discharging or depositing matter into the harbor which will obstruct or injure it. The intention of Congress in passing the act is clearly expressed in the title, which is:

"An act to prevent obstructive and injurious deposits within the harbor and adjacent waters of New York City," etc.

Deposits which do not obstruct or injuriously affect the harbor are not prohibited by the act. The G. L. Garlic (D. C.) 45 Fed. 380. It being admitted that the place where the matter entered the water of the harbor was a place where matter obstructive or injurious to the harbor could not be placed, discharged, or deposited under the act, the only question is whether or not the matter entering the waters of the harbor from the defendant's plant, through the ditch, pipe, or "by any process or in any manner," was obstructive or injurious to the harbor.

[3] The statute enumerates the specific materials which, in the opinion of Congress, would ordinarily be deposited into the waters and would obstruct and injure the harbor, but made sure that it should not be obstructed or injured because of the failure to mention all the materials that might possibly be placed or deposited in the prescribed limits, and so Congress added the words, "or any other matter of any kind." This means, applying the maxim of ejusdem generis, matter of the same general class as before mentioned. The materials mentioned, except acid, are mostly solids, and the injury which they would do the harbor would be to obstruct it. While obstruction is the principal injury Congress had in mind, it was not the only one; for "acid" would not obstruct, but would corrode and be detrimental to boats, wharves, etc., and would thus be injurious to the harbor as such. Owners and captains of boats would not care to enter harbors whose waters contained acids which were injurious to boats.

[4] There came from the plant of the defendant a material described by the witnesses as "fuel matter," "sludge," "black oil," and "oil and tar." Edwin H. Kinner said:

"On the northwest side of the plant there was a stream of this fuel matter coming through a ditch and into the Kills."

The matter came from the defendant's plant, into the waters of the Arthur Kill, and into the waters of the harbor of New York. John T. O'Mara said: "I found oil flowing through this creek, to the Kills, continually." He further said, in describing matter that came from defendant's plant: "Sometimes it gets solid. It is 2 inches thick on the dock." "Sludge" is specifically mentioned in the act, and is defined by the Standard Dictionary as:

"Refuse, acid, or alkali from the refining of petroleum; muddy or pasty refuse of various kinds; slime of ores; the plate covering an opening in a boiler for removal of sediment; also, the sediment."

This matter which came from the defendant's plant sometimes became solid and settled as a sediment. If it continued to be discharged or placed in the waters of the harbor without restriction, it would in time obstruct and injure the harbor. Masters of boats would naturally and ordinarily object to entering waters covered with oil and tar. These would surely prove injurious to the harbor, if not actually obstructive. We think the evidence establishes that the matter coming from the defendant's plant would be both obstructive and injurious to the harbor, and included in that general class of matter forbidden

to be placed, discharged, or deposited by any process or in any manner in the tidal waters of the harbor of New York.

The judgment of the District Court will therefore be affirmed.