**UNITED STATES of America**

v.

**PENNSYLVANIA INDUSTRIAL CHEM-ICAL CORPORATION, a Corporation.**

**Crim. No. 71–75.**

United States District Court,
W. D. Pennsylvania.

July 26, 1971.

---

1. N.T. 18.

2. N.T. 23, 24.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Harold Gondelman, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

TEITELBAUM, District Judge.

The defendant, Pennsylvania Industrial Chemical Corporation ("PICO"), was convicted on four counts of discharging refuse matter into a navigable water of the United States in violation of 33 U.S.C. § 407, commonly known as the Rivers and Harbors or Refuse Act of 1899.[1] The defendant filed no post-

1. Section 407 of 33 U.S.C. provides, in pertinent part, that,
 "[I]t shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of
manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any

trial motions. However, in view of the novelty of the legal issues involved, it is deemed appropriate to file this memorandum opinion; focusing, in part, on matters raised on defendant's Motion for Judgment of Acquittal.

Factually, the issues were few and simple. The information charged PICO, in four counts, with discharging and depositing refuse matter into the Monongahela River. Counts I and II dealt with effluent sampled from a certain concrete pipe on August 7 and 19, 1970, respectively, and Counts III and IV dealt with effluents sampled from a certain iron pipe on August 7 and 19, 1970, respectively. It was stipulated that PICO was the owner of a manufacturing establishment (a chemical plant) situated on the banks of the Monongahela River, that the concrete pipe and the iron pipe from which the discharges were sampled were owned by PICO, and that the Monongahela River is a navigable water of the United States. It was uncontroverted that while the concrete pipe served not only the defendant's manufacturing establishment but also a nearby residential area comprised of approximately six to eight houses, the iron pipe served the defendant's chemical plant exclusively. It was further uncontroverted that the defendant had not secured and in fact, had not applied for, a permit prior to the discharges. The controverted factual issues were as to the nature of the sampled discharges. The Government's expert characterized each of the samples as "industrial waste". The defendant's expert expressed skepticism at conclusively characterizing the effluent sampled from the concrete pipe on August 7, 1970 as "industrial discharge". He conceded that the other three samples were properly characterizable as "industrial discharge". He distinguished, however, between "industrial waste" and "industrial

discharge". He treated "industrial discharge" as a term applicable to the effluent from the time it left the pipe until it reached the river and considered that whether or not it was "industrial waste" depended upon its effect upon the river. As applied to the instant case, this is a distinction without a difference. The Refuse Act prohibits the discharge of *any* refuse matter, regardless of its effect, without a permit. This blanket prohibition is a clear expression of Congressional concern with the cumulative effect of many individually insignificant discharges. Thus, the effect of the particular effluent upon the river is irrelevant and testimony concerning it was excluded. When the Congress interdicted "any" discharge, it meant just that: that without a permit absolutely *no* amount of discharge was lawful. The defendant's suggested definition of refuse matter relating to the effect on the navigable water of the "industrial discharge" will be further dealt with hereinafter with regard to the defendant's Motion for Judgment of Acquittal.

The Court's charge to the jury defined "refuse matter" as encompassing, in *any* amount, all foreign substances and pollutants, except those flowing from streets and sewers in a liquid state, including industrial waste. This composite definition, which undoubtedly undermined the defendant's distinction, was taken directly from the decisions of the Supreme Court in United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966) and United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). The excepted refuse matter, i. e., that flowing from streets and sewers and passing therefrom in a liquid state was defined to the jury as meaning, "sewage", which again, was taken directly from *Republic Steel* in which the Supreme Court stated that,

shall float or be washed into such navigable water * * * [provided that] the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will

not be injured thereby, may permit the deposit of any material above mentioned in navigable waters * * * provided application is made to him prior to depositing such material * * *."

"[R]efuse flowing from 'sewers' in a 'liquid state' means to us 'sewage'."

"Sewage" was defined to the jury as, generally, that water, filth, and feculent matter deriving usually from human and domestic waste, but not including industrial waste.[2] Not surprisingly, the jury's finding, which must be construed, in conformity with the jury's verdict, in the light most favorable to the Government,[3] was that each of the effluents was "industrial waste", not "sewage", and therefore refuse matter in violation of the Refuse Act.

The defendant's Motion for Judgment of Acquittal at the close of the Government's case and renewed, in effect, after the close of all of the testimony, was based essentially on three grounds: (1) that both the concrete and iron pipes were "sewers" and therefore the refuse matter flowing therefrom was excepted from the prohibition of the Refuse Act; (2) that by the terms of the regulations adopted pursuant to the Refuse Act by the Secretary of the Army on April 7, 1971, the defendant had until July 1, 1971, to secure a permit to discharge refuse matter; and (3) that the matter which the defendant was discharging was in complete compliance with the water quality standards established by the Commonwealth of Pennsylvania and therefore not violative of the Act. The relevance of the regulations adopted by the Secretary and the water quality standards established by Pennsylvania, additionally, dogged the trial in the form of evidentiary offerings and rulings. At the trial both of them were regarded as irrelevant and were excluded from the evidence. An examination of each of these contentions follows.

## I. THE DEFINITION OF THE EXCEPTED REFUSE MATTER

The defendant sought to define the excepted refuse matter as including any and all matters flowing in a liquid state from an underground conduit. To support its definition, it offered Webster's definition of "sewer": an artificial usually subterranean conduit to carry off water and waste matter. That definition is not doubted. The word "sewer", however, does not stand alone in the exception. It is refuse matter which flows from streets and sewers and passes therefrom in a liquid state which is excepted. And that refuse matter meant to the Supreme Court in *Republic Steel* simply "sewage". What becomes important, then, in determining what refuse matter is excepted is the determination not of the construction or location of a particular conduit, but rather what it carries off. Therefore, the defendant's offered definition and effect of the term "sewer" was rejected, and *Republic Steel's* definition of the excepted refuse matter was submitted to the jury. Defendant's contention that anything which flows from a pipe is excepted from the interdiction of the Act is untenable.

## II. THE RELEVANCE OF THE ABSENCE OF AN ESTABLISHED PERMIT PROGRAM

The second ground of the defendant's contentions was that by virtue of the regulations [4] adopted by the Secretary of the Army on April 1, 1971, it had until July 1, 1971, to secure a permit to discharge refuse matter. Proposed and adopted expressly to establish a procedure for the issuance, pursuant to § 407 of the Refuse Act, of permits for dis-

---

2. This definition was forged from discussions found at 25 Am.Jur.2d, Drains and Drainage Districts § 1, 39 Words and Phrases, p. 100, and the cases cited therein.

3. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

4. The regulations, contained in § 209.131 of Part 202, Chapter II, Title 33 of the Code of Federal Regulations, were published at 36 Fed.Reg. 67, p. 6564 et seq.

charges or deposits into navigable waters, the regulations, by § 209.131(d)(3), clearly provide that all persons who are required by § 407 to secure a permit must do so no later than July 1, 1971. This provision, the defendant argued, implicitly suspended the enforcement of the Refuse Act until that date. Section 209.131(d) (4), however, uncompromisingly refutes that contention. That subsection provides that,

" * * * the mere filing of an application requesting permission to discharge or deposit into navigable waters or tributaries thereof will not preclude legal action in appropriate cases for Refuse Act violations".

Nothing could be more clear.

■ Alternatively, the defendant argued that the Government's admitted failure to establish permit procedures (particularly its failure to adopt application forms) under the Refuse Act until 1971 estopped its enforcement in 1970. The argument is not that the defendant had applied for and was denied a permit or that it attempted to apply for a permit and was unsuccessful. The defendant admitted that it had never attempted to secure a permit. The argument is simply that since the permit provision of the Refuse Act was neglected by the Government, the defendant was similarly entitled to neglect it. The language of § 407 disputes that entitlement. It provides that *prior* to the discharge of refuse matter, application must be made *to* the Secretary of the Army. It does not make it incumbent upon the Government to solicit applications; it makes it incumbent upon whomever proposes to discharge refuse matter to apply for a permit. Therefore the absence of an established procedure regarding the issuance of permits was deemed irrelevant.

## III. THE INTERRELATIONSHIP OF THE REFUSE ACT WITH PENNSYLVANIA'S WATER QUALITY STANDARDS

More problematical, though ultimately equally ill-founded, is the defendant's third contention. By it, the defendant contended that all of the matter discharged satisfied the water quality control standards of the Commonwealth of Pennsylvania and that, therefore, the Refuse Act was not violated. The defendant also sought to introduce the standards into evidence. Both the contention and the offer were rejected.

■■ The heart of the defendant's argument was that the Federal Water Pollution Control Act, 33 U.S.C. §§ 1151 to 1175, which was enacted into law by Congress in 1948 and amended as late as 1970, was a more contemporary Congressional decree on the subject of discharge into or pollution of navigable waters of the United States, and that therefore in harmonizing any conflicting policies of the Refuse Act with that Act, the former should be accommodated to the latter. The issue is not to be confused with that of whether or not the Refuse Act was designed to curb or control pollution of the nation's navigable waters. That issue was foreclosed by the Supreme Court in *Standard Oil* when it squarely and unmistakably resolved that the injury to the nation's waters "sought to be remedied was caused * * * in part by pollution".[5] Additionally, the decision of this Circuit in United States v. Esso Standard Oil Co., 375 F.2d 621 (C.A.3, 1967) is founded upon the assumption that § 407 is for the purpose of preventing pollution as well as insuring unobstructed navigation. This Court cannot reopen that issue. The issue here is whether or not the Water Pollution Con-

5. This construction first appears in La Merced, 84 F.2d 444 (C.A. 9, 1936) and was recently the clear holding in United States v. United States Steel Corp., 328 F.Supp. 354 (N.D.Ind., 1970) and United States v. Maplewood Poultry Co., 327 F.Supp. 686 (D.Me., 1971). The only reported decision construing § 407 to the contrary appears to be Guthrie v. Alabama By-Products Company, 328 F.Supp. 1140 (N.D.Ala., 1971) in which the Court, confronted with a suit by lower riparian landowners seeking to assert a private right of action under § 407, decided that since the Refuse Act was designed to protect navigation rather than prevent pollution no private right of action inured to the plaintiffs.

trol Act sets up standards by which discharged matter may be determined to be or not to be refuse matter within the meaning of the Refuse Act.

The short answer to that inquiry is found in § 1174 of the Water Pollution Control Act. Enacted into law as a part of the 1965 amendments, and amended in 1970, § 1174 provides that the Water Pollution Control Act shall not be construed as "affecting or impairing the provisions of section[s] 407". If, as must be assumed, the 1970 amendments were with full awareness of the Supreme Court's decision in *Standard Oil*, it seems obvious that the Congress chose to maintain rather than retrench from the provisions of § 407 as judicially interpreted.

The long answer is to consider the substances of the two Acts. The announced purpose of the Water Pollution Control Act is "to enhance the quality and value of our water resources and to establish a national policy for the prevention, control, and abatement of water pollution". If, as the Supreme Court has stated, the Refuse Act was at least partially intended to prevent pollution, the two Acts coincide in purpose. What differentiates them is the approach which each takes to achieve its purpose.

The approach of the Water Pollution Control Act, by the 1965 amendments, is to encourage individual states to establish "water quality criteria" which at the instance of the states the Federal government will enforce.[6] The act contemplates the adoption by the Federal government of acceptable state standards. Alternatively, the Act empowers the Federal government to establish standards. In addition to subjecting transgressors of state established and Federally adopted standards to abatement procedures, the Act requires, by § 1171(b) (1), that any applicant for a Federal permit to engage in an activity "which may result in any discharge into the navigable waters of the United States" shall provide the permitting authorities with certification from the state water pollution control agency that there is reasonable assurance that such discharge will not violate the applicable water quality standards. Without such certification, or if such certification is denied, no permit is issuable. To complement this provision, the regulations adopted by the Secretary of the Army on April 7, 1971, regarding permits for discharge or deposits into navigable waters pursuant to the Refuse Act forbid the issuance of a permit thereunder if an applicant is required to obtain state certification that its proposed discharge will not violate applicable water quality standards (as the Water Pollution Control Act requires) and such certification was denied.

Such certification, however, is by no means the sole determinant of the issuability of a permit. The regulations allow for the denial of a permit on several other grounds, including the impact on fish and wildlife and the risk to health or safety. Although the regulations command the Army Corps of Engineers to accept the findings of the Administrator of the Environmental Protection Agency (the agency responsible for the administration of the Water Pollution Control Act) respecting the applicable water quality standards and related water quality considerations, they empower the Corps of Engineers to make independent findings as to the other considerations relevant to the determination of whether or not a permit should issue. The supplemental independent authority given the Corps of Engineers suggests that the standards of the Water Pollution Control Act were intended to assist rather than supplant the application of the Refuse Act. Indeed the standards under the Refuse Act are more stringent. The apparent and logical purpose of the Congress in retaining the Refuse Act is to apply its permit provisions to obtain advance assurances of compliance with the standards of the Water Pollution Control Act. The harmony between the two Acts therefore, if imperfect, is not improbable.

6. See, particularly, 33 U.S.C. § 1160.

**1124**

The defendant's additional argument is that the Refuse Act makes a crime what the Water Pollution Control Act authorizes. This argument overlooks the permit provisions of the Refuse Act which are, in effect, its saving grace. The Refuse Act prohibits only the discharge of refuse matter into navigable waters without *first* securing a permit. Again, the standards under the Water Pollution Control Act come into play in determining whether or not a permit should issue. And that is a matter exclusively for the Corps of Engineers, not a jury. Thus, to deem the water quality standards of Pennsylvania relevant in determining whether or not matter discharged into navigable waters is "refuse matter" within the meaning of the Refuse Act in a criminal proceeding would require a judicial restructuring of the Congressional scheme. See United States v. Interlake Steel Corporation, 297 F.Supp. 912 (D.C.N.D.Ill., E.D., 1969). Therefore they were rejected.

For these reasons the defendant's Motion for Judgment of Acquittal prior to verdict was denied and the offer of evidence of the absence of either an established permit procedure or application forms for permits and of the water quality standards of Pennsylvania were rejected.