UNITED STATES *v.* PENNSYLVANIA
INDUSTRIAL CHEMICAL CORP.

No. 72-624. Argued March 27, 1973—Decided May 14, 1973

BRENNAN, J., delivered the opinon of the Court, in which DOUGLAS, WHITE, and MARSHALL, JJ., joined; in Part II of which BURGER, C. J., and STEWART and POWELL, JJ., joined; and in Part I of which BLACKMUN and REHNQUIST, JJ., joined. BURGER, C. J., and STEWART and POWELL, JJ., filed a statement dissenting from Part I of the Court's opinion, *post*, p. 675. BLACKMUN and REHNQUIST, JJ., filed a statement dissenting from the judgment and Part II of the Court's opinion, *post*, p. 675.

*William Bradford Reynolds* argued the cause for the United States. With him on the briefs were *Solicitor*

*General Griswold, Assistant Attorney General Frizzell, Deputy Assistant Attorney General Kiechel, Raymond N. Zagone,* and *James R. Moore.*

*Harold Gondelman* argued the cause for respondent. With him on the brief was *Herbert B. Sachs.**

MR. JUSTICE BRENNAN delivered the opinion of the Court.

We review here the reversal by the Court of Appeals for the Third Circuit of respondent's conviction for violation of § 13 [1] of the Rivers and Harbors Act of 1899,

---

*Briefs of *amici curiae* urging affirmance were filed by *Milton A. Smith* and *Henry L. Pitts* for the Chamber of Commerce of the United States; by *David McNeil Olds* and *William Foster* for the United States Steel Corp. et al.; and by *Judd N. Poffinberger, Jr.,* for Jones & Laughlin Steel Corp.

[1] Section 13, 33 U. S. C. § 407, provides:

"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided,* That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: *And provided further,* That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits

30 Stat. 1152, 33 U. S. C. § 407. Two questions are presented. The first is whether the Government may prosecute an alleged polluter under § 13 in the absence of the promulgation of a formal regulatory-permit program by the Secretary of the Army.[2] The second is whether, if the prosecution is maintainable despite the nonexistence of a formal regulatory-permit program, this respondent was entitled to assert as a defense its alleged reliance on the Army Corps of Engineers' longstanding administrative construction of § 13 as limited to water deposits that impede or obstruct navigation.

On April 6, 1971, the United States filed a criminal information against the respondent, Pennsylvania In-

---

to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful."

Section 16 of the Rivers and Harbors Act of 1899, 33 U. S. C. § 411, provides:

"Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, and 409 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction."

[2] A formal permit program under § 13 was established subsequent to the dates of the alleged violations involved in this case. See n. 9, *infra*. On October 18, 1972, Congress passed a comprehensive piece of legislation providing for national water quality standards and for a federal permit program relating to the discharge of pollutants into navigable waters. Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92–500, 86 Stat. 816. Section 402 of the 1972 Act, 33 U. S. C. § 1342, prohibits further issuance of permits under § 13 of the Rivers and Harbors Act of 1899 and designates the Administrator of the Environmental Protection Agency as the exclusive authority to permit discharges of pollutants into navigable waters.

dustrial Chemical Corp. (PICCO), alleging that on four separate occasions in August 1970 the corporation had discharged industrial refuse matters [3] into the Monongahela River [4] in violation of § 13 of the 1899 Act. By its terms, § 13 [5] prohibits the discharge or deposit into navigable waters of "any refuse matter of any kind of description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state." The second proviso to § 13 provides, however, that "the Secretary of the Army . . . may permit the deposit" [6] of refuse matter deemed by the Army Corps of Engineers not to be injurious to navigation, "provided application is made to [the Secretary] prior to depositing such material . . . ." [7] At trial, it was stipulated that PICCO operated a manufacturing plant on the bank

[3] The refuse matters were identified as "iron, aluminum, and compounds containing these chemicals, and chlorides, phosphates, sulfates and solids." App. 3.

[4] The Monongahela River is a 128-mile-long, navigable waterway that flows through western Pennsylvania and northern West Virginia.

[5] Section 13 is sometimes referred to as the "Refuse Act of 1899," but that term is a post-1970 label not used by Congress, past or present. Moreover, some authors use the term to refer only to § 13, see, e. g., Note, The Refuse Act of 1899: New Tasks for an Old Law, 22 Hastings L. J. 782 (1971), while others use it to refer to the entire Rivers and Harbors Act of 1899, see, e. g., Rodgers, Industrial Water Pollution and the Refuse Act: A Second Chance for Water Quality, 119 U. Pa. L. Rev. 761, 766 (1971).

[6] It has been suggested that since § 13 prohibits the "discharge, or deposit" of refuse but authorizes the Secretary to permit only "the deposit" of refuse, it may be appropriate to distinguish between a "discharge" and a "deposit" and hold that only a "deposit" of refuse may be permitted by the Secretary. Hearings before the Subcommittee on the Environment of the Senate Committee on Commerce, 92d Cong., 1st Sess., 31 (1971). However, we find no support for such a distinction in either the Act itself or its legislative history.

[7] The Secretary's authority to issue permits under § 13 terminated on October 18, 1972. See n. 2, supra.

of the Monongahela River, that PICCO-owned concrete and iron pipes discharged the refuse matter into the river, and that PICCO had not obtained a permit from the Secretary of the Army prior to the discharges in question. PICCO argued, however, that the discharges did not violate § 13 because (1) the liquid solution flowing from its pipes was "sewage" exempt from the statutory proscription; (2) the discharge did not constitute "refuse matter" within the meaning of § 13 because it was not matter that would "impede navigation"; and (3) the term "refuse" as used in § 13 must be defined in light of the water quality standards established pursuant to the Water Pollution Control Act of 1948 and its amendments.[8] In addition, PICCO sought to introduce evidence to show that its failure to obtain a § 13 permit was excusable in this instance because prior to December 1970 [9] the Army Corps of Engineers had not established a formal program for issuing permits under § 13 and, moreover, because the Corps consistently construed § 13 as limited to those deposits that would impede or obstruct navigation, thereby affirmatively misleading PICCO into believing that a § 13 permit was not required as a condition to

[8] 62 Stat. 1155, as amended, Act of July 17, 1952, c. 927, 66 Stat. 755; Water Pollution Control Act Amendments of 1956, 70 Stat. 498; Federal Water Pollution Control Act Amendments of 1961, Pub. L. 87–88, 75 Stat. 204; Water Quality Act of 1965, Pub. L. 89–234, 79 Stat. 903; Clean Water Restoration Act of 1966, Pub. L. 89–753, 80 Stat. 1246; Water Quality Improvement Act of 1970, Pub. L. 91–224, 84 Stat. 91.

[9] On December 23, 1970, the President announced the establishment of a formal § 13 permit program. Executive Order 11574, 35 Fed. Reg. 19627 (Dec. 25, 1970). The Corps of Engineers followed on December 30, 1970, with proposed regulations. 35 Fed. Reg. 20005 (Dec. 31, 1970). Final regulations implementing the President's program became effective April 7, 1971. 33 CFR § 209.131 (1972). That program, with certain changes, has now become part of the new permit program authorized by § 402 of the Federal Water Pollution Control Act Amendments of 1972. See n. 2, *supra*.

discharges of matter involved in this case. The District Court rejected each of PICCO's arguments as to the scope and meaning of § 13, disallowed PICCO's offers of proof on the ground that they were not relevant to the issue of guilt under § 13, and instructed the jury accordingly. PICCO was convicted on all four counts and assessed the maximum fine of $2,500 on each count. 329 F. Supp. 1118 (WD Pa. 1971).

On appeal, the Court of Appeals for the Third Circuit affirmed the District Court's holdings as to the application of § 13 to the matter discharged by PICCO into the river,[10] but rejected the District Court's conclusion that the § 13 prohibition was operative in the absence of formalized permit procedures. 461 F. 2d 468 (CA3 1972). The Court of Appeals reasoned that this interpretation was tantamount to reading § 13 to be an absolute prohibition against the deposit of any "foreign substance" into the navigable waters of the country and this would have had such a "drastic impact . . . on the nation's economy even in 1899," id., at 473, that this interpretation could not reasonably be imputed to Congress. Instead, the Court of Appeals concluded that Congress intended to condition enforcement of § 13 on the creation and operation of an administrative permit program. The Court of Appeals stated:

> "Congress contemplated a regulatory program pursuant to which persons in PICCO's position would be able to discharge industrial refuse at the discretion of the Secretary of the Army. It intended criminal penalties for those who failed to comply with this regulatory program. Congress did not, however, intend criminal penalties for people who

---

[10] This part of the Court of Appeals' decision is not before us for review. See *Brennan* v. *Arnheim & Neely*, 410 U. S. 512, 516 (1973); *NLRB* v. *International Van Lines*, 409 U. S. 48, 52 n. 4 (1972).

failed to comply with a non-existent regulatory program." *Id.,* at 475.

The Court of Appeals seems to have found support for this interpretation of § 13 in "Congress' subsequent enactments in the water quality field." *Id.,* at 473. The court stated that "[t]here would appear to be something fundamentally inconsistent between the program of developing and enforcing water quality standards under the Water Quality Act and section 407 of the Rivers and Harbors Act ·[§ 13], if the effect of the latter is to prohibit all discharges of industrial waste into navigable waters." *Ibid.* As it viewed the matter, "[w]hat makes the two statutes compatible is the permit program contemplated by Section 13." *Ibid.* Accordingly, the Court of Appeals held that it was error for the District Court to have refused PICCO the opportunity to prove the nonexistence of a formal permit program at the time of the alleged offenses.

As an alternative ground for reversal, a majority of the Court of Appeals held that the District Court erred in disallowing PICCO's offer of proof that it had been affirmatively misled by the Corps of Engineers into believing that it was not necessary to obtain a § 13 permit for the discharge of industrial effluents such as those involved in this case. If such facts were true, the Court of Appeals stated, it would be fundamentally unfair to allow PICCO's conviction to stand.

Thus, the Court of Appeals set aside PICCO's conviction and remanded the case to the District Court to give PICCO an opportunity to present the proffered proofs that had been disallowed by the District Court.

We granted the Government's petition for certiorari. 409 U. S. 1074 (1972). We agree with the Court of Appeals that the District Court's judgment of conviction must be reversed, but we cannot agree with the Court of Appeals' interpretation of § 13 as foreclosing

prosecution in the absence of the existence of a formal regulatory-permit program.

## I

Section 13 creates two separate offenses: the discharge or deposit of "any refuse matter" into navigable waters (with the streets-and-sewers exception); and the deposit of "material of any kind" on the bank of any navigable waterway or tributary where it might be washed into the water and thereby impede or obstruct navigation. *La Merced,* 84 F. 2d 444, 445 (CA9 1936); *United States v. Consolidation Coal Co.,* 354 F. Supp. 173, 175 (ND W. Va. 1973). The second proviso to § 13 authorizes the Secretary of the Army to exempt certain water deposits from the prohibitions of § 13, "provided application is made to him prior to depositing such material." In exercising that authority, the proviso requires the Secretary to rely on the judgment of the Chief of Engineers that anchorage and navigation will not be injured by such deposits. But, even in a situation where the Chief of Engineers concedes that a certain deposit will not injure anchorage and navigation, the Secretary need not necessarily permit the deposit, for the proviso makes the Secretary's authority discretionary—*i. e.,* it provides that the Secretary "may permit" the deposit. The proviso further requires that permits issued by the Secretary are to prescribe limits and conditions, any violation of which is unlawful. It is crucial to our inquiry, however, that neither the proviso nor any other provision of the statute requires that the Secretary prescribe general regulations or set criteria governing issuance of permits.

Thus, while nothing in § 13 precludes the establishment of a formal regulatory program by the Secretary, it is equally clear that nothing in the section *requires* the establishment of such a program as a condition to rendering § 13 operative. *United States* v. *Granite State Pack-*

*ing Co.,* 470 F. 2d 303, 304 (CA1 1972). In contrast, other provisions of the Rivers and Harbors Act of 1899,[11] do include a requirement for regulations. Consequently, we disagree with the Court of Appeals that § 13 itself precludes prosecution for violation of its provisions in the absence of a formal regulatory-permit program.

Similarly, there is nothing in the legislative history of § 13 that supports the conclusion of the Court of Appeals that such a requirement is to be read into the section. Section 13 is one section of a comprehensive law enacted in 1899 to codify pre-existing statutes designed to protect and preserve our Nation's navigable waterways. *United States* v. *Standard Oil Co.,* 384 U. S. 224, 226 (1966).

The history of the 1899 Act begins with this Court's decision in 1888 in *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1. The Court there held that there was no federal common law prohibiting obstructions and nuisances in navigable waters. In response to that decision, Congress passed a series of laws that were later reenacted as the Rivers and Harbors Act of 1899. Section 6 of the first such law, the Rivers and Harbors Act of 1890, provided in part:

> "That it shall not be lawful to cast, throw, empty, or unlade, or cause, suffer, or procure to be cast, thrown, emptied, or unladen, either from or out of any ship, vessel, lighter, barge, boat, or other craft, or from the shore, pier, wharf, furnace, manufacturing establishments, or mills of any kind whatever,

---

[11] See § 11 of the Act, 33 U. S. C. § 404, which instructs the Secretary of the Army to establish harbor lines beyond which works may not be extended or deposits made "except under such regulations as may be prescribed from time to time by him." See also § 4 of the Rivers and Harbors Act of 1905, 33 Stat. 1147, 33 U. S. C. § 419, authorizing regulations regarding the transportation and dumping of dredging material.

any ballast, stone, slate, gravel, earth, rubbish, wreck, filth, slabs, edgings, sawdust, slag, cinders, ashes, refuse, or other waste of any kind, into any port, road, roadstead, harbor, haven, navigable river, or navigable waters of the United States which shall tend to impede or obstruct navigation, or to deposit or place or cause, suffer, or procure to be deposited or placed, any ballast, stone, slate, gravel, earth, rubbish, wreck, filth, slabs, edgings, sawdust, or other waste in any place or situation on the bank of any navigable waters where the same shall be liable to be washed into such navigable waters, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided,* That nothing herein contained shall extend or be construed to extend . . . to prevent the depositing of any substance above mentioned under a permit from the Secretary of War, which he is hereby authorized to grant, in any place designated by him where navigation will not be obstructed thereby." 26 Stat. 453.

Four years later, Congress enacted the Rivers and Harbors Act of 1894. Section 6 of that Act provided in part:

"That it shall not be lawful to place, discharge, or deposit, by any process or in any manner, ballast, refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or any other matter of any kind other than that flowing from streets, sewers, and passing therefrom in a liquid state, in the waters of any harbor or river of the United States, for the improvement of which money has been appropriated by Congress, elsewhere than within the limits defined and permitted by the Secretary of War; neither shall it be lawful for any person or persons to move, destroy, or injure in any manner whatever any sea

wall, bulkhead, jetty, dike, levee, wharf, pier, or
other work built by the United States, in whole or
in part, for the preservation and improvement of
any of its navigable waters, or to prevent floods, or
as boundary marks, tide gauges, surveying stations,
buoys, or other established marks . . . ." 28 Stat.
363.[12]

In 1896, Congress commissioned the Secretary of War
to compile the various acts protecting navigable waters
and "to submit the same to Congress . . . together with
such recommendation as to revision, emendation, or en-
largement of the said laws as, in his judgment, will be
advantageous to the public interest." [13]  The Secretary,
in turn, delegated the task to the Chief of Engineers, and
in February 1897, the Chief of Engineers delivered a
draft proposal to the Secretary together with a cover
letter that read in part:

"I have the honor to submit herewith (1) a com-
pilation [of the various existing laws protecting
navigable waters] and (2) a draft of an act embody-
ing such revision and enlargement of the aforesaid
laws as the experience of this office has shown to be
advantageous to the public interest." [14]

In his compilation, the Chief of Engineers combined
the essentials of § 6 of the 1890 Act and of § 6 of the
1894 Act to form the present § 13 of the Rivers and Har-
bors Act of 1899.  Congress enacted the compilation with
virtually no debate that contains mention of the in-
tended operative scope of § 13.  It seems quite clear,

---

[12] This section of the 1894 Act, as well as § 6 of the 1890 Act, was
modeled after statutes passed in 1888 and 1886 pertaining only to
New York Harbor. See *United States* v. *Standard Oil Co.*, 384
U. S. 224, 226–228 (1966).

[13] Act of June 3, 1896, c. 314, § 2, 29 Stat. 234.

[14] H. R. Doc. No. 293, 54th Cong., 2d Sess. (1897).

however, that § 13 was intended to have no wider or narrower a scope than that of its two predecessor statutes. *United States* v. *Standard Oil Co.*, 384 U. S., at 227–228. It is true, of course, that the Chief of Engineers was authorized to recommend a "revision" or "enlargement" of the existing laws and that his cover letter accompanying the compilation referred to "a draft of an act embodying such revision and enlargement of the aforesaid laws." But the revision and enlargement were limited to "the existing law relating to the removal of wrecks," [15] and even on that subject the changes were minor. Indeed, Senator Frye, the Chairman of the Senate Rivers and Harbors Committee, stated in response to a question whether any great change was made in the existing law by the compilation: "Oh, no. There are not ten words changed in the entire thirteen sections. It is a compilation . . . [with] [v]ery slight changes to remove ambiguities." [16]

Thus, the Court of Appeals' interpretation of § 13 has no support in the predecessor statutes of § 13. Plainly, neither of the predecessor statutes contemplated that application of their operative provisions would turn on the existence of a formal regulatory program. On the contrary, § 6 of the 1890 Act provided only that its absolute ban on the discharge of enumerated substances could not be construed "to prevent" the Secretary of War from granting, in his discretion, a permit to deposit such material into navigable waters. And § 6 of the 1894 Act contained no direct permit authorization whatsoever. [17]

---

[15] *Ibid.* See 33 U. S. C. § 414.

[16] 32 Cong. Rec. 2297 (1899).

[17] It is true that § 6 of the 1894 Act prohibited discharges and deposits only "elsewhere than within the limits defined and permitted by the Secretary of War," but that language did not contemplate the establishment of a formal regulatory program by the Secretary. Section 6 of the 1890 Act granted the Secretary discretionary au-

We turn, then, to the Court of Appeals' assertion that its conclusion is supported by later congressional enactments in the water quality field. In this regard, the Court of Appeals placed primary reliance [18] on the 1965

thority to permit nonimpeding discharges and nothing in the 1894 Act purported to curtail that earlier grant of authority to the Secretary. Thus, the reference in the 1894 provision to "limits defined and permitted by the Secretary" refers merely to the Secretary's existing permit authority under the 1890 provision.

[18] Inferentially, the Court of Appeals also referred to § 4 of the Rivers and Harbors Act of 1905, 33 U. S. C. § 419. See 461 F. 2d 468, 475 n. 7. But that provision, which was originally proposed as an amendment to § 13 of the 1899 Act and clearly contemplated the establishment of a formal regulatory program by the Secretary (although it did not require that such a program be established), provides no support for the Court of Appeals' interpretation of § 13. On the contrary, the existence of § 4 of the 1905 Act tends to confirm the conclusion that § 13 is not conditioned on the establishment of a formal regulatory program. For the legislative history of § 4 explains that it was deemed desirable to give the Secretary authority to promulgate general permissive dumping regulations as to some bodies of water (such as New York and Boston Harbors) because a large amount of illegal dumping was going on in these waters at night and it was "almost impossible to detect" the violators, thereby making it "impossible to secure convictions." 39 Cong. Rec. 3078 (1905). A formal regulatory program, in other words, was the lesser of two evils as to these bodies of water since there were insufficient facilities and personnel to effectively enforce the general prohibitions of § 13. The implication is clear, however, that had the persons responsible for the unauthorized dumping been discovered, prosecution for violation of § 13 would have been the appropriate remedy, even though then, as at the time of the present offenses, there existed no formal regulatory program under § 13.

No explanation was given by Congress for its ultimate decision to codify § 4 of the 1905 Act separately rather than as an amendment to § 13. Possibly, Congress hoped that such regulations would be issued sparingly so as not to eviscerate the broad antidumping prohibitions of § 13. In any event, the Secretary's discretionary regulatory-program authority under § 4 of the 1905 Act certainly cannot be read into § 13 as an operative requirement, and absent establishment of a regulatory program under § 4 of the 1905 Act

and 1970 amendments to the Water Pollution Control Act of 1948—the Water Quality Act of 1965, 79 Stat. 903, and the Water Quality Improvement Act of 1970, 84 Stat. 91.[19] The Court of Appeals concluded that since the 1965 and 1970 Acts contemplated that discharges must meet minimum water quality standards, as set forth by state agencies, it would be "fundamentally inconsistent" to read § 13 as imposing a ban on all pollutant discharges. 461 F. 2d, at 473. We cannot agree. The Water Quality Acts were a congressional attempt to enlist state and local aid in a concentrated water pollution control and abatement program. The legislative directive of those statutes was that state and local officials, working in cooperation with federal officials, establish minimum water quality standards and create pollution prevention and abatement programs. Nothing in the statutes or their parent statute operated to permit discharges that would otherwise be prohibited by § 13, and in each case Congress specifically provided that the new statutes were not to be construed as "affecting or impairing the provisions of [§ 13 of the Rivers and Harbors Act of 1899]."[20]

Indeed, the water quality legislation expressly complements the provisions of § 13 of the 1899 Act. Section 13, although authorizing the Secretary of the Army to permit certain water deposits, contains no criteria to be followed by the Secretary in issuing such permits. The water quality legislation, on the other hand, calls for

as to a particular body of water, the prohibitions of § 13 remain intact and completely enforceable.

[19] These statutes are to a large extent superseded by the 1972 amendments to the Water Pollution Control Act. See n. 2, *supra*.

[20] See § 11 of the Water Pollution Control Act of 1948, 62 Stat. 1161, as amended in 1956, 70 Stat. 507, as further amended by the Water Quality Act of 1965, 79 Stat. 903, and as further amended by the Water Quality Improvement Act of 1970, 84 Stat. 113.

the setting of minimum water quality standards, and once such standards are established, federal permit authority, such as that vested in the Secretary of the Army by the second proviso to § 13, is specifically limited to that extent—*i. e.*, a permit could not be granted by the Secretary unless the discharge material met the applicable standards. Water Quality Improvement Act of 1970, § 103, 84 Stat. 107. In essence, therefore, the Water Quality Acts placed a limitation on the Secretary's permit authority without undermining the general prohibitions of § 13. See *United States* v. *Maplewood Poultry Co.*, 327 F. Supp. 686, 688 (Me. 1971); *United States* v. *United States Steel Corp.*, 328 F. Supp. 354, 357 (ND Ind. 1970); *United States* v. *Interlake Steel Corp.*, 297 F. Supp. 912, 916 (ND Ill. 1969).

We, therefore, find nothing fundamentally inconsistent between § 13 and the subsequent federal enactments in the water quality field. Section 13 declares in simple absolutes that have been characterized as "almost an insult to the sophisticated wastes of modern technology" [21] that "[i]t shall not be lawful" to discharge or deposit into navigable waters of the United States "any refuse matter of any kind or description whatever" except as permitted by the Secretary of the Army. In enacting subsequent legislation in the water quality field, Congress took special precautions to preserve the broad prohibitions of § 13 and in no way implied that those prohibitions were operative only under a formal regulatory-permit program. Similarly, nothing in the language or history of § 13 conditions enforcement of its prohibitions on the establishment of a formal regulatory-permit program and, as we have said in the past, "the history of this provision and of related

[21] Rodgers, Industrial Water Pollution and the Refuse Act: A Second Chance for Water Quality, 119 U. Pa. L. Rev. 761, 766 (1971).

legislation dealing with our free-flowing rivers 'forbids a narrow, cramped reading' of § 13." *United States* v. *Standard Oil Co.*, 384 U. S., at 226; *United States* v. *Republic Steel Corp.*, 362 U. S. 482, 491 (1960).

## II

We turn, therefore, to the Court of Appeals' alternative ground for reversing PICCO's conviction, namely, that in light of the longstanding, official administrative construction of § 13 as limited to those water deposits that tend to impede or obstruct navigation, PICCO may have been "affirmatively misled" into believing that its conduct was not criminal.[22] We agree with the Court of Appeals that PICCO should have been permitted to present relevant evidence to establish this defense.

At the outset, we observe that the issue here is not whether § 13 in fact applies to water deposits that have no tendency to affect navigation. For, although there was much dispute on this question in the past,[23] in

---

[22] It was conceded for purposes of this case that the refuse matter involved was not of a nature that would impede or obstruct navigation. 461 F. 2d, at 478. See also n. 3, *supra*.

[23] The seeming ambiguity of the language of § 13 and the sparse legislative history of that provision caused the lower courts to disagree over the years as to the proper scope of § 13. The second clause of § 13, which prohibits the deposit of refuse on the "bank" of any navigable water or tributary where such refuse may be washed into the water, is expressly limited to deposits that shall or may impede or obstruct navigation. The first clause of § 13, however, which is set off from the second clause by a semicolon, contains no language of its own limiting its prohibition to navigation-impeding deposits. Similarly, in regard to the two predecessor statutes of § 13, § 6 of the 1890 Act was expressly limited to navigation-impeding deposits, but § 6 of the 1894 Act was not. And the legislative history of § 13 and its predecessor statutes is hardly conclusive on this issue. But see Comment, Discharging New Wine into Old Wineskins: The Meta-

*United States* v. *Standard Oil Co., supra,* we held that
"the 'serious injury' to our watercourses . . sought to
be remedied [by the 1899 Act] was caused in part by
obstacles that impeded navigation and in part by pollu-
tion," and that the term "refuse" as used in § 13 "in-
cludes all foreign substances and pollutants . . . ." 384
U. S., at 228–229, 230.[24]   See also *Illinois* v. *City of Mil-
waukee,* 406 U. S. 91, 101 (1972).   Since then, the lower
courts have almost universally agreed, as did the courts
below, that § 13 is to be read in accordance with its plain
language as imposing a flat ban on the unauthorized de-
posit of foreign substances into navigable waters, regard-
less of the effect on navigation.   See, *e. g., United States*
v. *Granite State Packing Co.,* 343 F. Supp. 57, aff'd, 470
F. 2d 303 (CA1 1972); *United States* v. *Esso Standard Oil
Co. of Puerto Rico,* 375 F. 2d 621 (CA3 1967); *United
States* v. *Consolidation Coal Co.,* 354 F. Supp. 173 (ND
W. Va. 1973); *United States* v. *Genoa Cooperative
Creamery Co.,* 336 F. Supp. 539 (WD Wis. 1972); *United
States* v. *Maplewood Poultry Co.,* 327 F. Supp. 686

morphosis of the Rivers and Harbors Act of 1899, 33 U. Pitt. L. Rev.
483 (1972).

See as construing § 13 to be applicable to all water deposits re-
gardless of their tendency to obstruct or impede navigation,
*La Merced,* 84 F. 2d 444 (CA9 1936); *The President Coolidge,* 101
F. 2d 638 (CA9 1939); *United States* v. *Ballard Oil Co. of Hartford,*
195 F. 2d 369 (CA2 1952).   See as construing § 13 to be applicable
only to navigation-impeding deposits, *United States* v. *Crouch*
(1922) (unreported, see *United States* v. *Standard Oil Co.,* 384 U. S.,
at 229 n. 5); *Warner-Quinlan Co.* v. *United States,* 273 F. 503 (CA3
1921); *Nicroli* v. *Den Norske Afrika-Og Australielinie,* 332 F. 2d 651
(CA2 1964).

[24] *Standard Oil* involved an accidental discharge of aviation gaso-
line into navigable waters .   The District Court had made the find-
ing that the gasoline "was not such as to impede navigation."
*United States* v. *Standard Oil Co.,* No. 291, O. P. 1965, App. 8–11.

(Me. 1971); *United States* v. *United States Steel Corp.*, 328 F. Supp. 354 (ND Ind. 1970); *United States* v. *Interlake Steel Corp.*, 297 F. Supp. 912 (ND Ill. 1969); contra, *Guthrie* v. *Alabama By-Products Co.*, 328 F. Supp. 1140 (ND Ala. 1971), aff'd, 456 F. 2d 1294 (CA5 1972).

Nevertheless, it is undisputed that prior to December 1970 the Army Corps of Engineers consistently construed § 13 as limited to water deposits that affected navigation. Thus, at the time of our decision in *Standard Oil,* the published regulation pertaining to § 13 read as follows:

"§ 209.395. *Deposit of refuse.* Section 13 of the River and Harbor Act of March 3, 1899 (30 Stat. 1152; 33 U. S. C. 407), prohibits the deposit in navigable waters generally of 'refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state.' The jurisdiction of the Department of the Army, derived from the Federal laws enacted for the protection and preservation of the navigable waters of the United States, is limited and directed to such control as may be necessary to protect the public right of navigation. Action under section 13 has therefore been directed by the Department principally against the discharge of those materials that are obstructive or injurious to navigation." 33 CFR § 209.395 (1967).

In December 1968, the Corps of Engineers published a complete revision of the regulations pertaining to navigable waters. The new regulations pertaining to §§ 9 and 10 of the Rivers and Harbors Act of 1899, 33 U. S. C. §§ 401 and 403, dealing with construction and excavation in navigable waters, stated for the first time that the Corps would consider pollution and other conservation and environmental factors in passing on applications

under those sections for permits to "work in navigable waters." 33 CFR § 209.120 (d) (1969). But notwithstanding this reference to environmental factors and in spite of our intervening decision in *Standard Oil,* the new regulation pertaining to § 13 of the 1899 Act continued to construe that provision as limited to water deposits that affected navigation:

> "Section 13 of the River and Harbor Act of March 3, 1899 (30 Stat. 1152; 33 U. S. C. 407) authorizes the Secretary of the Army to permit the deposit of refuse matter in navigable waters, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, within limits to be defined and under conditions to be prescribed by him. Although the Department has exercised this authority from time to time, it is considered preferable to act under Section 4 of the River and Harbor Act of March 3, 1905 (33 Stat. 1147; 33 U. S. C. 419). As a means of assisting the Chief of Engineers in determining the effect on anchorage of vessels, the views of the U. S. Coast Guard will be solicited by coordination with the Commander of the local Coast Guard District." 33 CFR § 209.200 (e)(2) (1969).[25]

At trial, PICCO offered to prove that, in reliance on the consistent, longstanding administrative construction of § 13, the deposits in question were made in good-faith belief that they were permissible under law. PICCO

---

[25] Section 4 of the Rivers and Harbors Act of 1905 authorizes the Secretary of the Army to prescribe regulations to govern the transportation and dumping into navigable waters of dredgings, earth, garbage, and other refuse matter whenever in his judgment such regulations are required "in the interest of navigation." 33 U. S. C. § 419. Thus, the reference to that provision in the Corps' revised regulation did not signify a change in the Corps' construction of § 13.

does not contend, therefore, that it was ignorant of the law or that the statute is impermissibly vague, see *Connally* v. *General Construction Co.*, 269 U. S. 385 (1926); *Bouie* v. *City of Columbia*, 378 U. S. 347 (1964), but rather that it was affirmatively misled by the responsible administrative agency into believing that the law did not apply in this situation. Cf. *Raley* v. *Ohio*, 360 U. S. 423 (1959); *Cox* v. *Louisiana*, 379 U. S. 559 (1965).

Of course, there can be no question that PICCO had a right to look to the Corps of Engineers' regulations for guidance. The Corps is the responsible administrative agency under the 1899 Act, and "the rulings, interpretations and opinions of the [responsible agency] . . . , while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which . . . litigants may properly resort for guidance." *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944); *Maritime Board* v. *Isbrandtsen Co.*, 356 U. S. 481, 499 (1958). Moreover, although the regulations did not of themselves purport to create or define the statutory offense in question, see *United States* v. *Mersky*, 361 U. S. 431 (1960), it is certainly true that their designed purpose was to guide persons as to the meaning and requirements of the statute. Thus, to the extent that the regulations deprived PICCO of fair warning as to what conduct the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution. See Newman, Should Official Advice Be Reliable?—Proposals as to Estoppel and Related Doctrines in Administrative Law, 53 Col. L. Rev. 374 (1953); Note, Applying Estoppel Principles in Criminal Cases, 78 Yale L. J. 1046 (1969).

The Government argues, however, that our pronouncement in *Standard Oil* precludes PICCO from asserting

reliance on the Corps of Engineers' regulations and that, in any event, the revised regulation issued in 1968, when considered in light of other pertinent factors,[26] was not misleading to persons in PICCO's position.   But we need not respond to the Government's arguments here, for the substance of those arguments pertains, not to the issue of the availability of reliance as a defense, but rather to the issues whether there was in fact, reliance and, if so, whether that reliance was reasonable under the circumstances—issues that must be decided in the first instance by the trial court.   At this stage, it is sufficient that we hold that it was error for the District Court to refuse to permit PICCO to present evidence in support of its claim that it had been affirmatively misled into believing that the discharges in question were not a violation of the statute.

Accordingly, the judgment of the Court of Appeals is modified to remand the case to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE POWELL dissent in part, because they agree with the Court of Appeals that the respondent on remand should also be given the opportunity to prove the nonexistence of a permit program at the time of the alleged offenses.

MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST agree with Part I, but believing that the Court's opinion and judgment in *United States* v. *Standard Oil Co.,* 384

---

[26] The other factors that the Government argues must be taken into consideration are post-1968 regulations issued with respect to other sections of the 1899 Act and with respect to other acts, and certain Corps of Engineers press releases and periodic publications. Brief for United States 35–38.

U. S. 224 (1966), make absolutely clear the meaning and reach of § 13 with respect to PICCO's industrial discharge into the Monongahela River; that subsequent reliance upon any contrary administrative attitude on the part of the Corps of Engineers, express or by implication, is unwarranted; and that the District Court was correct in rejecting PICCO's offer of proof of reliance as irrelevant, would reverse the Court of Appeals with directions to reinstate the judgment of conviction.