UNITED STATES of America,
Plaintiff,

The State of Michigan et al.,
Plaintiffs-Intervenors,

State of Minnesota and Minnesota Pollu-
tion Control Agency, Plaintiffs,

v.

RESERVE MINING COMPANY et al.,
Defendants,

Northeastern Minnesota Development As-
sociation et al., Defendants-
Intervenors.

No. 5-72 Civ. 19.

United States District Court,
D. Minnesota,
Fifth Division.

Oct. 18, 1974.

See, also, 514 F.2d 492.

Robert G. Renner, U. S. Atty., Minneapolis, Minn., John P. Hills, Council on Environmental Quality, Washington, D. C., for plaintiff, United States.

Thomas F. Bastow, Washington, D. C., for plaintiff, United States Environmental Protection Agency.

Warren Spannaus, Atty. Gen., Jonathan H. Morgan, Sol. Gen., Peter W. Sipkins, Asst. Atty. Gen., Byron E. Starns, Chief Deputy Atty. Gen., Philip J. Olfelt, Asst. Atty. Gen., James M. Schloessler, Eldon G. Kaul, Sp. Asst. Attys. Gen., St. Paul, for plaintiffs-intervenors, State of Minnesota, Minnesota Pollution Control Agency.

Howard J. Vogel, Minneapolis, Minn., for plaintiffs-intervenors, Minnesota Environmental Law Institute, Northern Environmental Council, Save Lake Superior Association, Michigan Environmental Student Confederation.

Robert W. Warren, Atty. Gen., Robert B. McConnell, Asst. Atty. Gen., John E. Kofron, Asst. Atty. Gen., State of Wisconsin, Madison, Wis., for plaintiff-intervenor, State of Wisconsin.

Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Jerome Maslowske, Clive Gemmill, Asst. Attys. Gen., State of Michigan, Lansing, Mich., for plaintiff-intervenor, State of Michigan.

Scott H. Lang, Philip J. Mause, The Environmental Defense Fund, Inc., Washington, D. C., for plaintiff-intervenor, Environmental Defense Fund, Inc.

William P. Dinan, City Atty., Robert E. Asleson, Duluth, Minn., for plaintiff-intervenor, City of Duluth, Minnesota.

William A. Hammann, City Atty., Superior, Wis., for plaintiff-intervenor, City of Superior, Wisconsin.

Maclay R. Hyde, Lindquist & Vennum, Minneapolis, Minn., Edward T. Fride, Hanft, Fride, O'Brien & Harries, Duluth, Minn., for defendant, Reserve Mining Co.

William T. Egan, Rider, Bennett, Egan, Johnson & Arundel, Minneapolis, Minn., for defendant, Republic Steel Corp.

G. Alan Cunningham, Faegre & Benson, Minneapolis, Minn., for defendant, Armco Steel Corp.

Steven J. Seiler, Joseph B. Johnson, Reavill, Neimeyer, Johnson, Fredin & Killen, Duluth, Minn., for defendant-intervenor, Northeastern Minnesota Development Association.

John M. Donovan, Applequist, Nolan, Donovan, Larson, Barnes & Mathias, Duluth, Minn., for defendant-intervenor, Duluth Area Chamber of Commerce.

Fred Cina, Aurora, Minn., for defendants-intervenors, Village of Babbitt, Range League of Municipalities and Civic Associations.

Wayne G. Johnson, Johnson & Thomas, Silver Bay, Minn., for defendants-intervenors, Village of Beaver Bay, Silver Bay Chamber of Commerce, Village of Silver Bay, Town of Beaver Bay, Lax Lake Property Owners Association.

Keith M. Brownell, Bruce L. Anderson, Duluth, Minn., for defendant-intervenor, St. Louis County.

Mitchel H. Costley, Two Harbors, Minn., for defendant-intervenor, Lake County, Minnesota.

Ronald W. Thomas, Silver Bay, Minn., for defendant-intervenor, Town of Beaver Bay.

John G. Engberg, Helgesen, Peterson, Engberg & Spector, Minneapolis, Minn., for defendant-intervenor, United States Steel Workers.

## MEMORANDUM

### MILES W. LORD, District Judge.

The Court has before it certain claims for relief that were for various reasons taken under advisement and not resolved prior to the issuance of the injunction in this case. The matters are largely cumulative and obviously had no effect on the issuance of the injunction on April 20, 1974. However, in an effort to accommodate the desires of the Court of Appeals, this Court has made and will continue to make an effort to arrive at a resolution of all of the claims asserted by the various parties to this litigation as expeditiously as possible. In that regard, the Court hereby issues the following Memorandum which shall become part of the Court's Findings of Fact and Conclusions of Law in this matter.

### Refuse Act Claim

In the Supplemental Memorandum of May 11, 1974, the Court deferred ruling on the plaintiffs' allegations that Reserve's discharge into Lake Superior is in violation of the Refuse Act, 33 U.S.C. § 407, since the Court had restricted the parties on the presentation of this claim in an effort to reach a speedy resolution of the public health issue. In that Memorandum, the Court indicated its willingness to hear further testimony on these issues if necessary. However, at the hearing on August 23, 1974, both parties agreed that the matter had been fully submitted and was ripe for adjudication by this Court, without the necessity of further evidence.

It is Reserve's claim that they are in compliance with the statute since they have a presently valid Refuse Act permit. It is the plaintiffs' position that Reserve has no valid permit that could serve as a defense to the alleged Refuse Act violations.

The plaintiffs argue that the permit Reserve was issued was authorized under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, and not Section 13 (the Refuse Act), that even if the permit was a Refuse Act permit, it has been revoked. Finally, it is argued that the permit Reserve possesses does not sanction the specific conduct alleged to be in violation of the Act.[1]

The issue of whether or not Reserve has a Refuse Act permit was raised in various pretrial motions for dismissal and summary judgment. In the Memorandum and Order of November 30, 1972, the Court recognized that the Refuse Act set forth no procedural requirements or administrative machinery for considering permit applications. Ac-

---

[1]. Reserve argues that the United States failed to allege this particular claim in their pleadings. The Court is not persuaded by the defendant's arguments. The complaint of the United States as amended is certainly sufficient to raise the matters in issue. Furthermore, the defendants were put on notice as early as November 30, 1972 that this Court considered the issue to be raised by the pleadings. *See*, United States v. Reserve Mining Co., No. 5–72 Civ. 19, Memorandum and Order, November 30, 1972 (D.Minn.). The matter was pled, litigated and is ripe for adjudication.

cording to the statute, the only prerequisite to obtaining a Refuse Act permit was the permission of the Secretary of the Army upon the recommendation of the Chief of the Army Corps of Engineers. Reserve's permit, although by its terms a Section 10 permit, also met the underlying pre-requisites for a Section 13 permit when issued since it was issued by the Secretary upon approval of the Chief of the Army Corps of Engineers. Although the thrust of the Secretary's concern might vary slightly when considering a Section 13 permit (dumping refuse) as opposed to Section 10 (building a wharf), the terms of the permit appear broad enough to afford some protection under both sections. However, before Reserve can set forth this permit as a defense to an alleged Refuse Act violation, it must be determined if the terms of the permit sanction the specific conduct that is challenged by the plaintiffs.

As was discussed in the Court's Memorandum of November 30, 1972, the Refuse Act has been consistently construed by the administrative agencies as to be applicable only to those discharges impeding navigation. *See,* 33 C.F.R. §§ 209, 395 (1968). Recently the Courts have given the Refuse Act a broader construction and extended its coverage to discharges that are harmful without respect to their effect on navigability. United States v. Pennsylvania Chem. Corp., 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973); United States v. Standard Oil, 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). In United States v. Pennsylvania Chem. Corp. (PICCO), criminal charges were brought against PICCO alleging that on four separate occasions PICCO deposited industrial refuse in violation of the Refuse Act. PICCO was convicted on each count and assessed the maximum fine, $2,500.00 for each violation. 329 F.Supp. 1118 (W.D.Pa.1971).

The conviction was reversed on appeal, 461 F.2d 468 (3rd Cir. 1972), on two grounds:

1. The absence of a formal permit program precluded enforcement of the Act.

2. PICCO should have been permitted to prove that they were affirmatively misled by the Corps of Engineers into believing that the Refuse Act was inapplicable to their type of discharge.

On petition to the Supreme Court, the Court rejected the first ground relied upon by the Court of Appeals determining that the terms of the statute did not require a formal permit procedure. However, the Supreme Court agreed with the Court of Appeals as to the second point and upheld the reversal of the conviction remanding the matter to the District Court to permit PICCO to prove its defense of estoppel.

The Supreme Court traced the history of administrative approach to the Refuse Act. The Court stated 411 U.S. at pp. 672, 673, 93 S.Ct. at p. 1815:

Nevertheless, it is undisputed that prior to December 1970 the Army Corps of Engineers consistently construed § 13 as limited to water deposits that affected navigation.

. . . . . .

In December 1968, the Corps of Engineers published a complete revision of the regulations pertaining to navigable waters. The new regulations pertaining to §§ 9 and 10 of the Rivers and Harbors Act of 1899, dealing with construction and excavation in navigable waters, stated for the first time that the Corps would consider pollution and other conservation and environmental factors in passing on applications under those sections for permits to "work in navigable waters." 33 CFR § 209.120(d) (1969). But notwithstanding this reference to environmental factors and in spite of our intervening decision in Standard Oil, the new regulation pertaining to § 13 of the 1899 Act continued to con-

strue that provision as limited to water deposits that affected navigation.[2]

Reserve's permit was originally issued in 1948 and modified in 1950 and 1960. At all times when Reserve's permit was considered, the prevailing view of the law was that the only proper consideration under the Refuse Act was the effect a particular discharge might have on navigability. Yet it is now claimed that this permit sanctions general pollution as well as obstruction to navigation. Looking to the specific terms of the permit, such an argument cannot stand. At the top of the original permit, it provides:

NOTE—It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State, or local laws or regulations, nor does it obviate the necessity of obtaining State assent to the work authorized. It merely EXPRESSES THE ASSENT OF THE FEDERAL GOVERNMENT SO FAR AS CONCERNS THE PUBLIC RIGHTS OF NAVIGATION. (Emphasis in the original.)

Similarly, the only restrictions in the permit speak in terms of preserving the free navigability of the Lake.

Whereas Reserve's permit, although on its face a Section 10 permit, could be asserted as a defense to claims by the United States that the discharge impedes the free navigability of the Lake, thus violating the Refuse Act, the permit cannot serve as a defense to a claim under the Refuse Act that the discharge pollutes the Lake. This specific conduct is not santioned by the terms of the permit.

At this point, Reserve is in the same position as PICCO. Neither have a permit under the Refuse Act that sanctions their refuse deposits. Both maintain that they have acted in good faith and in reliance upon existing administrative rulings and regulations. In PICCO, the Supreme Court held:

To the extent that the regulations deprived PICCO of fair warning as to what conduct the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution. 411 U.S. at 674, 93 S.Ct. at 1816.

However, in the instant case, we are not dealing with a criminal prosecution for past conduct. Here the plaintiffs maintain that defendants' continuing conduct is in violation of the Refuse Act and they should be ordered to stop violating the Act until they get the necessary permit.

The Court has found that Reserve has no permit that sanctions its disposal and dispersal of carcinogenic materials throughout the Lake. The question now becomes because of the government's erroneous legal interpretation of the provisions of the Refuse Act, are the plaintiffs estopped from seeking prospective compliance with the Refuse Act; is the government precluded from insisting that the defendants comply with the law and either cease dumping or obtain a permit? The Court considered this issue in its Memorandum of November 30, 1972 at p. 12. The Court at that time concluded that the United States Government's suit to protect the environment was essentially a public governmental function not unlike the exercise of the police power by a state. *Citing* Sanitary Dist. of Chicago v. United States, 266 U.S. 405, 420–427, 45 S.Ct. 176, 69 L.Ed. 352 (1925); Utah Light & Power Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791, 408–409; 2 K. Davis Administrative Law Treatise Section 1701

2. *See,* 33 C.F.R. § 209.200(e)(2) (1969).

(1958). The Court concluded then that the principles of estoppel should not preclude such a claim. In light of the subsequent discovery and proof that Reserve's discharge contains carcinogenic materials that end up in the drinking water of thousands, the Court reasserts its earlier ruling that estoppel should not bar the claims under the Refuse Act.

■ Reserve maintains that it relied in good faith on this permit when it expended great sums of money in the construction of its plant. It is argued that a Court in equity must give great weight to this reliance when fashioning an equitable decree. In that the Court has already issued an injunction without regard to the Refuse Act violation, this argument to some extent becomes moot.[3]

However, in fashioning its decree on April 20, the Court did give consideration to defendants' capital investment. See, Supplemental Memorandum, dated May 11, 1974, pp. 83–95. However, in light of the findings that the discharge exposed thousands of people to significant quantities of carcinogenic materials, and the additional finding that it was economically and technologically feasible to abate the discharge, the fact that defendants had expended sums of money in the Silver Bay operation could not be afforded much weight. Additionally, the fact that defendants had free use of Lake Superior as a tailings depository for years amounted to a subsidy and competitive advantage over other taconite industries in the state to such an extent that defendants have recouped much, if not all, of their initial investment.[4] Finally, in any balance of the equities in relation to Reserve's reliance on the Refuse Act permit, it must be kept in mind that it was originally represented that Reserve's discharge would settle on the bottom of the Lake proximate to Silver Bay with little or no impact on the rest of the Lake. As the evidence clearly established in the trial, the tailings were dispersed throughout the Lake entering the drinking water of several municipalities. In such a case, it is not inequitable for the government to insist that its laws be carried out.

### Reserve's Counterclaims

At the close of the trial, Reserve again asserted it counterclaims against the United States alleging:

■ 1. That if the Court determines that Reserve's permit is not a valid Refuse Act permit they should recover in tort for negligence and misrepresentation from the United States and Reserve should be awarded money damages.

As was previously discussed, the Court has made no finding that Reserve's permit is invalid, only that it does not sanction the pollution of the lake. The fact that Reserve sought a broader permit than was issued does not give rise to claims of negligence or misrepresentation on behalf of the government. There is no evidence of any negligence on behalf of the United States officials nor are there allegations of the type of representation that would give rise to a tort claim against government officials. 28 U.S.C. § 2680(h).

■ Furthermore, even if defendants could point to some tortious action on behalf of the United States in the issuing of the permit, defendants can point to no damages that would stem from such activity. As stated previously, the Refuse Act permit under no circumstances could serve as a defense to the other claims made by the plaintiffs. The Court's injunction was based solely on the strength of the other claims established by the plaintiffs without regard to the Refuse Act claim. Hence,

---

3. The Court has consistently held that Reserve's permit could not serve as a defense to claims of violation of the Federal Water Pollution Control Act of 1948, 33 U.S.C. § 1151 et seq., and the claim of public nuisance. Memorandum and Order, November 30, 1972, pp. 5–11.

4. See, Court's Memorandum of August 3, 1974, p. 29.

in no way could any money expended in the modification of Reserve's discharge to comply with this Court's order and existing law be attributed to alleged tortious actions of United States agents in issuing a Refuse Act permit. Reserve's first counterclaim must be dismissed for failure to state a claim upon which relief could be granted.

2. Reserve's second counterclaim essentially alleges that any limitation, restriction or termination of Reserve's present method of discharge without compensation would constitute a violation of due process under the Fifth Amendment to the United States Constitution. Whereas the claim for relief in the form of money damages may not be ripe the allegations could be construed as seeking a declaratory judgment to the effect that their practice of disposing of tailings into Lake Superior marks a property interest that is subject to protection under the Fifth Amendment. Such an issue is ripe for adjudication, has been fully briefed, and is appropriate for consideration on the merits.

Reserve claims right, license and authority to deposit its tailings pursuant to its permit. However, it has been consistently held that such permits do not give rise to inviolable property rights.[5] Looking to the terms of the permit, it is clear that it gives no property right in the use of the lake but merely marks the government's assent which may be limited or withdrawn without compensation. Furthermore, it is well established that private interests in using navigable waters are subject to a superior authority vested pursuant to the Commerce Clause in the United States to regulate navigable water.

Our cases hold that such an interest [in utilizing the water power of a navigable stream] is not compensable because when the United States asserts its superior authority under the Commerce Clause to utilize or regulate the flow of the water of a navigable stream there is no "taking" or "property" in the sense of the Fifth Amendment because the United States has a superior navigation easement which precludes private ownership of the water or its flow. United States v. Grand River Dam Authority, 363 U.S. 229, 231, 80 S.Ct. 1134, 1136, 4 L.Ed.2d 1186 (1959).

*See also,* United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1955). It is clear that the abatement of pollution is a proper exercise of that power. Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), cert. denied 410 U.S. 910, 91 S.Ct. 873, 27 L. Ed.2d 808.[6] The modification or restriction of defendants' practice of depositing tailings into Lake Superior does not give rise to claims for compensation pursuant to the Fifth Amendment.

Reserve argues that even if their claims do not amount to a valid counterclaim, their claim for relief is proper in the sense that a Court in equity has broad powers to condition its grant of equitable relief. It is defendants' claim because Reserve relied on the representations of the United States that if the Court should enjoin the present mode of discharge that it should condition the granting of an injunction upon payment of money by the United

---

5. United States v. Orandler-Dunbar Water Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1912); Sanitary District v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1924); Miami Beach Jockey Club, Inc. v. Dern, 65 U.S.App.D.C. 369, 83 F.2d 715 (1936), cert. denied 299 U.S. 556, 57 S.Ct. 17, 81 L.Ed. 409 (1936).

6. Even in a situation outside of the government's paramount interest in navigable wa-

ters (land regulation), regulation reasonably related to the public welfare, as in the instant case, does not give rise to Fifth Amendment rights to compensation. City of St. Paul v. Chicago, St. P., M. & O. Ry. Co., 413 F.2d 672 (8th Cir. 1969), cert. denied 396 U.S. 985, 90 S.Ct. 478, 24 L.Ed.2d 449; Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928).

States. To the extent this Court has the equitable power to grant such an order in light of the equities in this case [7] this Court is unwilling to do so.

Reserve asserted two counterclaims against Minnesota and the Minnesota Pollution Control Agency (hereinafter Minnesota) similar in nature to its second counterclaim against the United States. It was claimed by Reserve that any alteration in Reserve's present mode of discharge would constitute a taking of property without just compensation and mark an impairment of contractual rights of Reserve. To the extent Reserve seeks a declaratory judgment as to the legal effect of their alleged right, license and authority to continue dumping in Lake Superior, the issue is ripe for adjudication as was the similar claim against the United States. The origin of Reserve's alleged right, license and authority in this claim stems from its state permits. It is Reserve's theory that any modification of the permits deprives them of a property interest and impairs their contractual rights.

However, Minnesota has not sought to alter or modify the permits. It was the state's claim that Reserve's deposition was in violation of the terms of the permits and the Court so found.[8] Even assuming arguendo that the permits might create a property right pursuant to state law, such a right has not been infringed and no contract has been impaired by the Court's finding that the permit has been violated.[9] Furthermore, the action by the state to abate pollution and protect the public health is a proper exercise of the state's police power in the public interest which cannot be precluded by such claims.[10]

7. *See*, Supplemental Memorandum dated May 11, 1974, pp. 108 et seq. *Also see*, previous discussion pp. 6, 7.

8. In the Supplemental Memorandum, the Court made the following findings at pp. 82, 83:

Secondly it has been clearly established that the terms of the permits are being violated. Both permits set out a nine square mile zone of discharge. However, the evidence in this case is that the discharge is not confined to this nine mile zone of discharge and is dispersed throughout the western arm of the lake. In particular the discharge is in violation of subdivision (d) of the permits which provide: (d) Such tailings shall not be discharged so as to result in any material clouding or discoloration of the water at the surface outside of said zone except during such time as turbidity from natural conditions in the adjacent portions of the lake outside of said zone may be caused by storms, nor . . . any material adverse effects on fish life or public water supplies or in any other material unlawful pollution or the waters of the lake or in any material interference with navigation or in any public nuisance outside of said zone.
The discharge causes discoloration of the surface water outside of the zone of discharge, causes an increase in turbidity, and adversely affects the public water supplies of several communities resulting in unlawful pollution of the lake.

9. An analogy could be drawn to the situation where a private citizen upon obtaining a driver's license purchases a new car. If, after repeated violations of the terms of the license and the traffic laws of the state, the driver's license is revoked, should the state be required to compensate the citizen for his expenditures in purchasing and operating his car and his additional expense of transportation he must now incur because of the revocation of the license?

10. *E. g.*, Minnesota Ass'n. of Public Schools v. Hanson, 287 Minn. 415, 424–425, 178 N.W. 2d 846, 853 (1970) (alternative ground); Moskovitz v. St. Paul, 218 Minn. 543, 551, 16 N.W.2d 745, 749 (1944); Bybee v. Minneapolis, 208 Minn. 55, 59, 292 N.W. 617, 619 (1940); Sanitary District v. United States, 266 U.S. 405, 426, 45 S.Ct. 176, 69 L.Ed. 352 (1925) (Holmes, J.); Denver & Rio Grande R.R. v. Denver, 250 U.S. 241, 244, 39 S.Ct. 450, 63 L.Ed. 958 (1919); Pierce Oil Corp. v. Hope, 248 U.S. 498, 39 S.Ct. 172, 63 L.Ed. 381 (1919) (Holmes, J.); St. Paul v. Chicago, St. P., M. & O. Ry., 139 Minn. 322, 166 N.W. 335 (1918); Pennsylvania Hospital v. Philadelphia, 245 U.S. 20, 23, 38 S.Ct. 35, 62 L.Ed. 124 (1917); State ex rel. St. Paul v. Great Northern Ry., 134 Minn. 249, 255–256, 158 N.W. 972, 974 (1916); Atlantic Coast Line R.R. v. Goldsboro, 232 U.S. 548, 558, 34 S.Ct. 364, 58 L.Ed. 721 (1914); Texas & N. O. R. R. v. Miller, 221 U.S. 408, 414, 31 S.Ct. 534, 55 L.Ed. 789 (1911); State ex rel. Minneapolis v. St. Paul, M. & M. Ry., 101

## Wisconsin Public Trust

■ In the Supplemental Memorandum of May 11, 1974, the Court found that the discharge from Reserve Mining Co. flowed into Wisconsin constituting a common law nuisance under both the Wisconsin and federal ·common law. The Court also found that the discharge marked a continuing violation of Sec. 30.12 Wis.Stats., and Sec. 29.29(3) Wis. Stats. The Court at that time did not decide Wisconsin's claim that the discharge also violates Wis.Stat. 30.15. However, in that Section 30.15 declares that a violation of Sec. 30.12 is a public nuisance, the Court hereby finds that the discharge also violates Sec. 30.15. The Court has under advisement Wisconsin's additional claim that the discharge is in violation of the Wisconsin public trust doctrine as set forth in Just v. Marinette County, 56 Wis.2d 7, 201 N.W.2d 761 (1972); State v. Public Service Comm., 275 Wis. 112, 81 N.W.2d 71 (1956); Muench v. Public Service Comm., 261 Wis. 492, 53 N.W. 2d 514 (1952).

■ It is claimed that as trustees of the state's navigable waters, any impairment of these waters creates not only standing to sue but an affirmative cause of action to prevent material impairment to the property, pursuant to the public trust doctrine. Defendants concede that the state of Wisconsin has standing to sue pursuant to the public trust doctrine but argues that it does not create an affirmative cause of action. This precise issue has not been discussed nor decided by the Wisconsin courts. It may be that when faced with a particular set of facts a Wisconsin court will extend its public trust doctrine to provide an affirmative cause of action for the state as trustee. However, in the situation before this Court there is neither necessity nor compelling reason to extend Wisconsin's public trust doctrine to provide an affirmative cause of action in addition to the traditional causes of action asserted by the State of Wisconsin.

## Minnesota's Pending Claims

The Court also took under advisement the claim of the State of Minnesota that Reserve's discharge into the ambient air violates APC 3 and M.S.A. § 116.081(1) (1971) since they have no permits.

■ It is the defendants' claim that no permit is required for their air discharge in that they have entered into a stipulation agreement with the state pursuant to the state's implementation plan of the Clean Air Act.[11] In the stipulation agreement, the company concedes it is in violation of APC 5 but agrees to undertake an abatement program in exchange for the state's promise not to take administrative, "legal or equitable action against Reserve with respect to matters covered by this stipulation agreement." [12] It is Reserve's claim that this provision precludes the PCA from asserting any claims of violations of APC 1, 3 and 5.

APC 3 requires that a permit be acquired for installing certain equipment and operating a point source. M.S.A. § 116.081 makes it unlawful to operate an emission facility without a permit. There is nothing in the stipulation agreement pertaining to APC 3 that would preclude its enforcement. Paragraph 14 dealing with permits provides as follows:

14. *Permits.* Upon compliance by Reserve with applicable laws regulations and standards of the Agency, and upon application by Reserve, the

---

Minn. 545, 546, 112 N.W. 1142 (1907), aff'd mem., 214 U.S. 497, 29 S.Ct. 698, 53 L.Ed. 1060 (1909); Stone v. Mississippi, 101 U.S. 814, 25 L.Ed. 1079 (1879).

11. 42 U.S.C. § 1857 et seq.

12. It should be noted that the state was not the moving party in a coercive action to enforce these regulations. They were involuntary plaintiffs joined by motion of Reserve. It is in this context that they raise the violations of state air quality regulations.

Agency shall issue appropriate installation and operating permits.

This provision clearly contemplates that Reserve must make the necessary applications and qualify for permits in compliance with existing law. Reserve has not applied for permits,[13] has no valid permits and is in violation of APC 3 and M.S.A. § 116.081.

 Defendants further argue that paragraph 12 of the agreement affords them protection from the state's claims. It provides:

12. *Interim Operation.* Pending completion of the pollution abatement program under the compliance schedule described herein, Reserve shall not cause any emission from its facilities to occur at a level beyond the present level.

Attached to the stipulation agreement are the results of Reserve studies on the suspended particulate matter in the Silver Bay area for the months of July, August, September and October 1972. The stipulation agreement was based on this data which revealed only isolated instances in which the secondary standard in APC 1 was exceeded and a day in which the primary standard in APC 1 was exceeded. However, the data introduced at trial, Reserve Mining Exhibit 304, reveals that since October 1972 there has been a marked increase in the number of days in which the secondary standard was exceeded and several days in which the primary standard was exceeded. The inference the Court draws from this data is that defendants have violated the stipulation agreement in that emissions from the facility at Silver Bay caused levels of particulate matter in excess of those levels which formed the basis for the stipulation agreement. This violation of paragraph 12 in and of itself is sufficient to justify the state's action in this case.

In addition the quality of the discharge into the ambient air took on a different character when it was discovered that millions of carcinogenic fibers were among the emissions from Reserve's stacks. This fact was not discovered until after the stipulation agreement had been entered into. Whereas certain levels of emission of relatively harmless particles may be acceptable to the state, the same level of emission of carcinogenic fibers may not. To the extent that contract principles are operative, the agreement could be rescinded on the grounds of mutual mistake as to an essential element of the bargain. *See,* Stanton v. Morris Const. Co., 159 Minn. 380, 199 N.W. 104 (1924). Furthermore, in that the state is the party now enforcing the agreement the principles set out in the cases cited in footnote 10 are applicable here. The state cannot bargain away its police power to protect the health of its citizens.

In the State of Minnesota's third Amended Joint Complaint, it alleges that Reserve discharges mine waste water into the Dunka and Partridge Rivers without a permit in violation of M.S.A. § 115.07(1). The statute in question states:

It shall be unlawful for any person to construct, install or operate a disposal system, or any part thereof, until plans therefor shall have been submitted to the commission unless the commission shall have waived the submission thereof to it and a written permit therefor shall have been granted by the commission.

The evidence relied on by the State to prove this allegation was the testimony of Reserve Vice President Kenneth Haley who testified:

A portion of it is pumped out of the eastern end of our pit which flows into the—finally would flow into the Dunka River. And from the more westerly areas of our pit, that is not used, pumped to the crusher, pumped into the large swamp that is just south of our pit, that would finally get into

16. *See,* Minnesota Exhibit 109.

the Partridge River. (TR p. 15,127–128)

This type of clear admission by a man who was proffered as an all around expert on mine and plant operation at Reserve is convincing.

Reserve in its briefs on this subject does not attack the veracity of Mr. Haley's statement but argues that it was made in a different context. The Court cannot see how this should affect Mr. Haley's ability to tell the truth. Reserve additionally and more strenuously argues that this Court's decision on April 19, 1974 to allow the State to amend its pleadings to conform to the proof in accordance with Rule 15(b), F.R.Civ.P., and to allege this violation, was a violation of their right to due process.

The Court can deal with this problem summarily since it specifically asked all parties on August 23, 1974 to point out any issues on which further evidence needed to be taken. Since the Court must assume that Reserve was mindful of the charges that the plaintiffs were making against it, they have waived their right to present evidence to refute this charge. Parenthetically, the Court notes that there can be no doubt that the pits are pumped out as Mr. Haley stated nor can there be any doubts that the water reaches the two rivers in question when the topography of the land as shown in the evidence amply demonstrated the watersheds and their destinations.

For these reasons, the Court finds that Reserve is in violation of M.S.A. § 115.07(1).

In its third Amended Complaint, the State of Minnesota charges Reserve with wrongful appropriation of state water without a permit. The statute in question, M.S.A. § 105.41, states in part that:

It shall be unlawful for the state, any person, partnership, or association, private or public corporation, . . . to appropriate or use any waters of the state, surface or underground, with-out the written permit of the commissioner, . . . . .

The term "waters of the State of Minnesota" is defined in M.S.A. § 105.-37(7) as:

"waters of the state" means any water, surface or underground, except those surface waters which are not confined but are spread and diffused over the land.

There is insufficient evidence in the record at this time to prove a violation of this statute. The only evidence on this point was the testimony of Minnesota's witness, Mr. Eugene Gere, who said that Erie's Dunka pit collects rain water and seepage from the surrounding area, and therefore Reserve's must do the same. This was confirmed by Mr. Kenneth Haley, Reserve's chief expert witness, who admitted that water collected and has to be pumped out of the Babbitt pit.

This decision does not preclude the state from attempting to enforce this statute in a subsequent proceeding for future violations if the evidence becomes available and is presented in an appropriate forum. The Court only holds that there is insufficient evidence to prove past violations of this statute.

There is sufficient evidence on the operation of the pilot plant at Reserve to find that its operation, although not comparable to the operation of the main plant in size, may be comparable in harm due to the addition of toxic agents to its discharge. Clearly its operation runs afoul of the law since it is undisputed that the permit issued by the state to sanction its operation expired on its face in 1970.

Reserve contests this assessment by stating that the permit was orally renewed by the then director of the Minnesota Pollution Control Agency, Mr. Bidalich. Reserve also contends that the fact that they have been operating the pilot plant since 1970, submitting necessary reports to appropriate agencies somehow proves that the state considers a permit to be in effect. The lat-

ter argument is patently incorrect since the state has been trying to halt the total discharge into the air and water since at least 1970.

As to the first defense, there is only the hearsay statement of the defendants to contradict the clear fact of the permit expiration and the unrelenting persistence of the state as they used every means to stop the discharges. In addition, M.S.A. § 115.07(1) calls for a written permit, not an oral one. If Reserve is attempting to set up a possible defense of equitable estoppel, it should be noted that estoppel against the state does not arise from situations such as this since, those who deal with an officer of the state are bound to know the extent of his power and authority. Filor v. United States, 9 U.S. (Wall) 45, 19 L.Ed. 549 (1809); State v. Shevlin-Carpenter Co., 102 Minn. 470, 113 N.W. 634 (1907); Martin v. Common School Dist. No. 3, 163 Minn. 427, 204 N.W. 320 (1925).

Based on the reasons set forth in this Memorandum, the Court finds:

1. Defendants' deposition of waste into Lake Superior is in violation of the Refuse Act, 33 U.S.C. § 407; Wis.Stat. §§ 30.12 and 30.15.

2. Defendants' discharge of wastes from its pilot plant into Lake Superior without a valid permit is in violation of M.S.A. § 115.07(1).

3. Defendants' discharge of water into the Dunka and Partridge Rivers without a permit is in violation of M.S.A. § 115.07(1).

4. Defendants' discharge of wastes into the ambient air without a permit is in violation of APC 3 and M.S.A. § 116.-081(1).

5. The Wisconsin public trust doctrine does not give Wisconsin an affirmative cause of action in this litigation.

6. The state of Minnesota has failed to establish a past violation of M.S.A. § 105.41.

7. Reserve's counterclaims against the State of Minnesota and the United States are hereby dismissed.

8. Certain claims in this case remain unresolved and the Court will attempt to decide them as expeditiously as possible. However, consistent with the Court's determination as to the finality of its previous Orders, final judgment shall be entered as to all decided claims in that there is no just reason for delay.

The question of fines and penalties, the question of sanctions for failure to make discovery and the question of liability of defendants for the water filtration systems that may be installed in Duluth, Minnesota and Superior, Wisconsin cannot be decided at this time. The state of Minnesota is asking that the Court impose the maximum fine permissible under law which could amount to several millions of dollars. The Court has some discretion in the matter and it is this Court's view that it is not in a position to evaluate the equities until it is apprised of the course of action defendants must take in order to come into compliance with applicable law. For example, if defendants must expend substantial amounts in plant modification in order to comply with the ultimate ruling in this case, and to operate the plant consistent with such ruling, this Court might at that time be very reluctant to add any substantial sum in the form of fines if the effect of such additional financial burden would substantially interfere with the financing of the facility. In any event, this Court is unable to make a decision involving so many variables and uncertainties which affect such substantial sums of money and have such enormous social consequences until the Court is fully and finally apprised of all of the facts and circumstances which are then to be considered and are not now available to this Court.

It is so ordered.