March 12, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1542

BRUCE A. HOWELL, ET AL.,

Plaintiffs, Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR ELIOT
SAVINGS BANK,

Defendant, Appellee

ERRATA SHEET

The opinion of this court issued on February 17, 1993 is
amended as follows:

On page 4, third line of footnote 1, replace "charges" with
"changes".

February 17, 1993
UNITED STATES COURT OF APPEALS
For The First Circuit

No. 92-1542

BRUCE A. HOWELL, ET AL.,

Plaintiffs, Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR ELIOT SAVINGS BANK,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Breyer, Chief Judge,

Higginbotham, Senior Circuit Judge,*

and Boudin, Circuit Judge.

Edwin A. McCabe with whom Karen Chinn Lyons, Joseph P. Davis,

III, The McCabe Group, and Lawrence Sager were on brief for appellant.

Lawrence H. Richmond, Counsel, Federal Deposit Insurance

Corporation, with whom Ann S. DuRoss, Assistant General Counsel,

Federal Deposit Insurance Corporation, Colleen B. Bombardier, Senior

Counsel, Federal Deposit Insurance Corporation, John C. Foskett,

Michael P. Ridulfo and Deutsch Williams Brooks DeRensis Holland &

Drachman, P.C. were on brief for appellee.

February 17, 1993

*of the Third Circuit, sitting by designation.

BOUDIN, Circuit Judge. Appellants in this case are

former officers of a failed bank. They sued the FDIC as the

bank's receiver when the FDIC disallowed their claims for

severance pay under their contracts with the bank. The

district court sustained the FDIC, reasoning that Congress

had restricted such claims. Although the statute in question

is not easily construed and the result is a severe one, we

believe that the officers' claims fail, and we sustain the

district court.

The facts, shorn of flourishes added by the parties, are

simple. In 1988 and 1989, the four appellants in this case

were officers of Eliot Savings Bank ("Eliot") in

Massachusetts. In November 1988, when Eliot was undergoing

financial strain, Eliot made an agreement with Charles Noble,

its executive vice president, committing the bank to make

severance payments (computed under a formula but apparently

equivalent to three years' salary) if his employment were

terminated. In August 1989, the bank entered into letter

agreements with three other officers--appellants Bruce

Howell, Patricia McSweeney, and Laurence Richard--promising

them each a year's salary as severance in the event of

termination. Finally, in December 1989 a further letter

agreement was made with Noble, reaffirming the earlier

agreement with him while modifying it in certain respects.

-2-

The agreements make clear that they were not intended to

alter the "at will" employment relationship between Eliot and

the officers. The bank remained free to terminate the

officers, subject to severance payments, and (so far as

appears) the officers were not bound to remain for any fixed

term. The letter agreements with the three officers other

than Noble state that the severance payments were promised in

consideration of the officers' "willingness to remain" in the

bank's employ; and the same intent can be gleaned from the

two agreements with Noble. The weakened financial condition

of the bank is adverted to in each of the four 1989

agreements.

At some point in 1989 the FDIC began to scrutinize

closely Eliot's affairs. The officers allege, on information

and belief, that the FDIC and the bank agreed that Eliot

would take steps to retain its qualified management; and the

complaint states that the FDIC "knew and approved" of the

four letter agreements made in 1989. The officers also

contend that they were advised by experienced counsel at a

respected law firm that the severance agreements were valid

and would withstand an FDIC receivership if one ensued. It

is further alleged that, in December 1989, the FDIC and the

bank entered into a consent order that provided that the bank

would continue to retain qualified management.

-3-

Eliot failed and was closed on June 29, 1990. The FDIC

was appointed its receiver. Within two months, the officers

were terminated. The officers then made administrative

claims for their severance benefits pursuant to applicable

provisions of FIRREA, 12 U.S.C. 1821(d)(3), (5), the

statute enacted in 1989 to cope with the torrent of bank

failures.1 In October 1990, the FDIC disallowed the claims,

stating that the claims violated public policy. Although

the FDIC letter is not before us, it apparently is based upon

the FDIC's general opposition to what are sometimes called

"golden parachute payments," a subject to which we will

return. Following the disallowance, the officers pursued

their option, expressly provided by FIRREA, to bring an

original action in federal district court. 12 U.S.C.

1821(d)(6).

In their district court complaint, the officers asserted

claims against the FDIC for breach of contract, for breach of

the contracts' implied covenant of fair dealing, and for

detrimental reliance. The FDIC moved to dismiss or for

summary judgment. Thereafter, the officers sought to amend

their complaint by adding a promissory estoppel claim and by

1FIRREA is the Financial Institutions Reform, Recovery,
and Enforcement Act of 1989, 103 Stat. 183, codified in
various sections of 12 and 18 U.S.C. Among other changes,
FIRREA amended pre-existing provisions specifying the FDIC's
powers as receiver and the claims provisions governing claims
against failed banks.

-4-

explicitly naming the FDIC in its "corporate capacity" as

well as in its capacity as receiver. In a bench decision,

the district judge ruled that the FDIC had lawfully

repudiated the contracts between Eliot and the officers and

that under FIRREA there were no compensable damages for the

resulting breach. As for the promissory estoppel claim, the

court deemed it "futile" and refused to allow the amendment;

the court referred to the general principle that estoppel

does not operate against the government and to the FDIC's

broad grant of authority under FIRREA. The officers then

sought review in this court.

The first claim made on appeal, taken in order of logic,

is that the FDIC's repudiation of the severance agreements

was itself invalid. At this point we need to explain briefly

the structure of the statute. Section 1821 governs, among

other matters, the powers of the FDIC as receiver, 12 U.S.C.

1821(d), the procedure for processing claims against the

failed bank, 12 U.S.C. 1821(d)(3), (5), and substantive

rules for contracts entered into prior to the receivership.

12 U.S.C. 1821(e). Section 1821(e)(1) gives the receiver

the right to disaffirm or repudiate any contract that the

bank may have made before receivership if the FDIC decides

"in its discretion" that performance will be "burdensome" and

that disavowal will "promote the orderly administration" of

the failed bank's affairs. 12 U.S.C. 821(e)(1).

-5-

The power of a receiver to repudiate prior executory

contracts made by the debtor, a familiar incident of

bankruptcy law, see 11 U.S.C. 365 (executory contracts and

unexpired leases), means something less than might appear.

By repudiating the contract the receiver is freed from having

to comply with the contract, e.g., American Medical Supply,

Inc. v. FTC, 1990 U.S. Dist. LEXIS 5355 (D. Kan. 1990)

(specific enforcement), but the repudiation is treated as a

breach of contract that gives rise to an ordinary contract

claim for damages, if any. Whether that claim is then

"allowed" by the receiver and if so whether there are assets

to satisfy it, are distinct questions; at this point we are

concerned only with the receiver's authority to affirm or

disaffirm. In this case the officers do not dispute that the

FDIC did repudiate the severance agreements. Rather the

officers argue that the repudiation is ineffective, and the

agreements remain enforceable, because the FDIC did not make

the statutory findings, or abused its discretion, or both.

Interesting questions are posed by such a challenge, but

the questions need not be resolved in this case. The claim

was not made in the district court and, accordingly, it is

waived. Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987).

The complaint makes only the barest reference to abuse of

discretion by the FDIC, mentioning it not as a separate claim

but in the prefatory description of facts; and there is no

-6-

reference whatever to this line of argument, or to lack of

required FDIC findings, in the opposition filed by the

officers to the FDIC's motion to dismiss. A litigant would

normally have an uphill battle in overturning an FDIC finding

of "burden," if the FDIC made one, but in all events the

issue has not been preserved in this case.

The second ground of appeal raises the central question

before us, namely, whether a damage claim based on a

repudiated severance contract is allowed under FIRREA. A

stranger to FIRREA might think it apparent that breach of a

contract to make severance payments inflicts damages on a

discharged employee in the amount of the promised payments.

The hitch is that in FIRREA Congress adopted restrictive

rules that limit the damages permitted for repudiated

contracts. 12 U.S.C. 1821(e). In a general provision

subject to certain exceptions, 12 U.S.C. 1821(e)(3)(A)(i)

provides that the receiver's liability for a repudiated

contract is "limited to actual direct compensatory damages .

. . ." Additionally, section 1821(e)(3)(B) provides:

For purposes of subparagraph (A), the term `actual
direct compensatory damages' does not include--
(i) punitive or exemplary damages;
(ii) damages for lost profits or opportunities; or
(iii) damages for pain and suffering.

The question thus framed is whether, or to what extent,

the statute's limitation to "actual direct compensatory

damages" bars the contractual severance claims made in this

-7-

case.2 The question is easy to state but less easy to

answer. Although FIRREA's concept of limiting allowable

claims for contract damages echoes the approach of the

Bankruptcy Code, 11 U.S.C. 502, that statute is more specific

and informative. In particular, section 502(b)(7) limits

claims by a terminated employee for future compensation to

one year's pay. So far as appears from the parties' briefs,

FIRREA's broad exclusionary language ("actual direct

compensatory damages") has been plucked out of the air by

Congress, although the general purpose is obvious enough.

If there is any illuminating legislative history or

precedent, it has not been called to our attention by the

parties and we have been unable to locate anything very

helpful.

It is fair to guess that Congress, faced with

mountainous bank failures, determined to pare back damage

claims founded on repudiated contracts. In all likelihood,

the legislators knew that many uninsured depositors and other

unsecured creditors would recover little from failed banks;

and the government's own liability (to insured depositors)

would be effectively increased to the extent that remaining

assets went to contract-claim creditors of the bank rather

than to the government (as the subrogee for the insured

2We do not reach the FDIC's alternative argument that
the severance pay would be barred as representing "lost
profits or opportunity."

-8-

depositors whom the FDIC compensated directly). It is thus

not surprising that Congress might wish to disallow certain

damage claims deemed less worthy than other claims. This

assessment casts some light on Congress' approach and

provides a predicate for considering the severance contract

claims posed in this case.

We conclude, not without some misgivings, that the

officers' claims do not comprise allowable claims under

FIRREA. The amounts stipulated by the Eliot contracts are

easily determined--a formula payment for Noble and a year's

pay for the others. But the statute calls upon the courts to

determine the nature of the damages stipulated by the

contract or sought by the claimant in order to rule out any

but those permitted by Congress. In this case, analysis

persuades us that the damages provided by Eliot's repudiated

severance contracts with its officers, and sought by the

appellants for their breach in this case, are not "actual

direct compensatory damages" under 12 U.S.C.

1821(e)(1)(A)(i).

Severance payments, stipulated in advance, are at best

an estimate of likely harm made at a time when only

prediction is possible. When discharge actually occurs, the

employee may have no way to prove the loss from alternative

employments foregone, not to mention possible disputes about

the discharged employee's ability to mitigate damages by

-9-

finding new employment. A severance agreement properly

protects against these uncertainties by liquidating the

liability. Such payments comprise or are analogous to

"liquidated damages," at least when the amount is not so

large as to constitute an unenforceable penalty. See

generally E. Allan Farnsworth, Contracts 12.18 (2d ed.

1990); Charles McCormick, Damages 146 (1935).3

Unfortunately for the appellants, the statutory

language--"actual direct compensatory damages"--does not

quite embrace the payments promised by the officers'

severance agreements. Eliot's officers may, or may not, have

suffered injury by remaining at the bank, depending on what

options they had in the past that are not available now.

Conceivably, they suffered no damage at all; conceivably,

their actual damages from staying at Eliot exceed the amounts

stipulated in the agreements. The point is that severance

payments of this class do not comprise actual damages. Thus,

based on statutory language alone, the starting point for

3Of course, the other office of a severance agreement
may be to provide a cause of action for an at will employee
who otherwise has no contractual claim at all. E.g., Pearson

v. John Hancock Mutual Life Ins. Co., 979 F.2d 254, 258 (1st

Cir. 1992). In this case, the at will status of the
appellants is not decisive; they did have contracts and our
task is to see whether the promised payments fit into
FIRREA's compensable-damage pigeonhole.

-10-

statutory construction, the FDIC appears to have the better

case.

One might argue that, although the severance payments

are not actual damages, they are often a good-faith effort to

estimate such damages and should in such cases be permitted

as consistent with the spirit of the statute, if not its

language. But the spirit of the statute is quite otherwise.

The statute actually excludes (see 12 U.S.C. 1821(e)(3)(B))

two less-favored categories of what are indisputably actual

damages (lost profits, pain and suffering), reinforcing the

impression that Congress intended strictly to limit allowable

claims for repudiated contracts. The treatment of leases in

the next subsection is yet further evidence of Congress'

temper. 12 U.S.C. 1821(e)(4) provides that, if the

receiver disaffirms a lease to which the bank was lessee, the

lessor's damages are limited to past rent and loss of future

rent is not compensable. Yet the lessor may have accepted a

lower monthly rent in exchange for a long-term lease and

protection against the risk of an empty building. As with

severance pay, the lessor may have foregone other

opportunities but the loss is not to be recompensed.

Each side has offered in its favor still broader policy

arguments. The officers claim that the disallowance of

promised severance pay will mean that a troubled bank cannot

effectively contract to retain able officers who may rescue

-11-

it. The FDIC, by contrast, implies that the present

arrangements may be "golden parachutes" by which insiders

take advantage of the crisis to assure themselves of a

handsome farewell gift from a failing bank. The FDIC also

points to regulations it has proposed, but not yet adopted,

to curtail severely such arrangements; its new rules would

disallow severance contracts for bank officials except in

narrowly defined conditions, such as where an officer is

induced to leave another post to help a troubled thrift.4

The FDIC claims that the regulations and their authorizing

statute reflect public policy.

The policy arguments of the officers and the FDIC may

each have some force, to some extent they offset each other,

and neither set is decisive in this case. In answer to the

officers, it may be said that their argument presents a fact

and policy question best left to Congress and to expert bank

regulators; those bodies in turn have ample incentives to

make the right adjustment in delimiting severance agreements.

As to the FDIC's argument, Congress has not declared

severance payments unlawful but merely authorized the FDIC to

do so, and the latter's proposed regulations are not yet in

4The regulations were proposed on October 7, 1991, 56
Fed. Reg. 50529, pursuant to the Comprehensive Thrift and
Bank Fraud Prosection and Taxpayer Recovery Act of 1990, 104
Stat. 4859, adding 12 U.S.C. 1828(k) (FDIC "may prohibit or
limit, by regulation or order, any golden parachute payment .
. . .").

-12-

force. Further, this case arises on a motion to dismiss, so

there is no basis whatever for considering any imputation of

bad motive or misconduct on the part of Eliot's officers.

The officers' last argument in support of their contract

claims is that the "actual damage" restriction, if read as

the FDIC urges, is an unconstitutional taking.

Alternatively, they say that the statute is so close to the

line that it should be read favorably to them to avoid a

constitutional question. These arguments were not made in

the district court and we decline to consider them.

Litigation is a winnowing process and, except in criminal

cases where the stakes are different, only in extraordinary

circumstances will we take up a contention that has not been

made in the district court. We note that arguments that the

FDIC might itself have made, but did not, have been similarly

ignored, including a possible claim that its order

disallowing the severance claims is a currently effective

"order" under the golden parachute statute, 12 U.S.C.

1828(k).

What remains to be considered are the detrimental

reliance claim in the original complaint and the related

promissory estoppel claim advanced by the attempted

amendment. In substance, the officers argue that the FDIC,

acting in its supervisory or "corporate" capacity prior to

Eliot's failure, was so closely associated with the bank's

-13-

severance promises that their repudiation by the FDIC as

receiver violates estoppel doctrine or gives rise to a new

claim against the FDIC. That the FDIC was implicated in

forming the severance contracts is a factual proposition,

apparently denied by the FDIC, but we must accept the

proposition as true for purposes of reviewing the motion to

dismiss.

The FDIC seeks to answer the officers' estoppel and

reliance argument by citing to cases that say that the FDIC

is treated as two separate persons when acting in its

"corporate" capacity as a regulator and when acting in its

capacity as receiver. E.g., FDIC v. Roldon Fonseca, 795 F.2d

1102, 1109 (1st Cir. 1986). On this theory, the FDIC is not

liable in this case as regulator, even if it affiliated

itself with the promise of severance pay, since "it" (the

FDIC as regulator) did not break the promise; and as

receiver, the FDIC was free to disavow the contracts because

"it" (the FDIC as receiver) made no promises.

The officers argue that this "separate capacities"

doctrine was designed for a different purpose and should not

be applied in the present context to produce an unjust

result. But the Eighth Circuit applied this doctrine without

much hesitation to a case in which the FDIC as receiver

sought to repudiate a lease it had previously accepted in its

capacity as "conservator," conservator being yet another

-14-

incarnation in which the FDIC sometimes appears. RTC v.

CedarMinn Building Limited Partnership, 956 F.2d 1446 (8th

Cir.), cert. denied, 113 S. Ct. 94 (1992). As for the

claimed injustice, it is not clear that any apparent inequity

worked in this case is greater than occurs in the usual case

in which the separate-capacities doctrine is invoked. FDIC

v. Roldon Fonseca, 795 F.2d at 1109.

There is another answer to the officers' claim that

rests more solidly on visible policy. Putting to one side

the separate capacities defense, courts are for obvious

reasons reluctant to permit estoppels against the United

States, e.g., Heckler v. Services of Crawford County, 467

U.S. 51, 60 (1984), although exceptions may be found. United

States v. Pennsylvania Industrial Chemical Corp., 411 U.S.

655, 670-675 (1973). There are many reasons for the

reluctance, including a concern for the public purse and a

recognition that the government--unlike the normal actor--is

an enterprise so vast and complex as to preclude perfect

consistency. See generally Hansen v. Harris, 619 F.2d 942,

649-58 (2d Cir. 1980) (Friendly, J., dissenting), rev'd sub

nom. Schweiker v. Hansen, 450 U.S. 785 (1981). While leaving

many questions unanswered, the Supreme Court has made clear

that an estoppel against the United States is not measured by

the rules used for ordinary litigants. Heckler, 467 U.S. at

62.

-15-

In the present case, even the most liberal reading of

the reliance and estoppel counts leaves the FDIC in the

position of one who encouraged or invited the bank's promise

of severance pay. Yet (as we construe the actual damages

clause), Congress has decided that, in parceling out fairly

the limited assets of a failed bank, contract damages

reflecting severance pay are not permitted. "[T]o permit

[the claim] . . . would be judicially to admit at the back

door that which has been legislatively turned away at the

front door." FDIC v. Cobblestone Corp., 1992 U.S. Dist.

LEXIS 17024 (D. Mass. 1992). It is hard to imagine a less

attractive case for creating a new judicial exception to the

general rule against estoppel of the government.

The judgment of the district court is affirmed.

-16-